**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| ARIEL SEAFOODS OF FLORIDA, INC.<br>419 Mountain Drive<br>Destin, FL 32541<br><br>JENSEN TUNA, LLC<br>5885 State Highway 311<br>Houma, LA 70360<br><br>WATER STREET SEAFOOD, INC.<br>391 Market Street<br>Apalachicola, FL 32320<br><br>DAVID WALKER<br>401 Diane Drive<br>Andalusia, AL 32420<br><br>*Plaintiffs*<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE<br>Room 14555<br>1315 East-West Highway<br>Silver Spring, MD 20910<br><br>HOWARD LUTNICK, in his official capacity as<br>Secretary of Commerce<br>U.S. Department of Commerce<br>1401 Constitution Ave NW<br>Washington, DC 20230<br><br>*Defendants* | Civil Action No. 25-cv-3117 |

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      This case challenges the failure of Defendants National Marine Fisheries Service

("NMFS") and Howard Lutnick (in his official capacity as Secretary of Commerce) to apply a

mandatory accountability measure for Gulf greater amberjack, which should have reduced the

recreational annual catch limit for the 2025-2026 fishing year to zero as a consequence for a

substantial overage that occurred in the prior fishing year. The accountability measure is required

under governing regulations at 50 C.F.R. § 622.41(a)(2), which were duly promulgated under the

Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1891d

("Magnuson-Stevens Act" or "the Act").

2.      Defendants have a discrete and mandatory duty to implement the regulation in

question, as they are expressly tasked with implementing fishery management plans and

amendments adopted under the Act. The regulatory text at 50 C.F.R. § 622.41(a)(2), moreover,

was duly promulgated as part of an amendment to the Gulf Reef Fish Fishery Management Plan,

and the provisions are specific and non-discretionary.

3.      Defendants' failure to implement the regulations at 50 C.F.R. § 622.41(a)(2) is

right now allowing the recreational fishing season for greater amberjack to proceed illegally. The

default recreational season in the Gulf runs from September 1 to October 31 of each year, unless

modified by an accountability measure. Defendants withheld the required accountability

measure, which would have served to close the recreational season entirely because the amount

of the overage from last year is greater than the default annual catch limit for this year. By

withholding the accountability measure, Defendants allowed recreational fishing for greater

amberjack to commence on September 1, 2025.  Fishing is currently underway, and every fish

that is caught reduces Defendants' ability to recover and repay the overage from last season.

4.      The purpose of the accountability measure at 50 C.F.R. § 622.41(a)(2) is to safeguard the health of the Gulf greater amberjack stock. This stock of fish has been under a rebuilding plan for over two decades, and has chronically struggled to make progress. Overages like the one that occurred last year—where the recreational sector caught more than double its allowed limit—harm the greater amberjack stock and reduce its chances of rebuilding successfully, unless they are "paid back" in the following year as required by the regulations.

5.      Plaintiffs Ariel Seafoods of Florida, Inc., Jensen Tuna, LLC, Water Street Seafood, Inc., and David Walker are companies and an individual engaged in fishing as well as buying and selling commercially-caught fish. Plaintiffs' business operations depend on greater amberjack, among other stocks in the Gulf Reef Fish fishery. Greater amberjack rebuilding is important to Plaintiffs; as fishing-dependent businesses and individuals, their futures depend on sustainable fisheries and healthy fish stocks.

6.      Plaintiffs, individually and through their owners and officers, also are long-time participants in the federal fishery management process. They know that their businesses and identities as fishermen and fish dealers depend on successful fishery management in the Gulf. Here, the commercial amberjack season was shut down on August 29, 2025—correctly and in accordance with the accountability measure at 50 C.F.R. § 622.41(a)(1)(i)—yet three days later, the recreational sector arbitrarily was allowed to proceed with an illegal season. Defendants' failure to apply regulations evenhandedly between the commercial and recreational sectors is not limited to this instance, and it compromises the integrity of the fishery management process. As stakeholders watch the rules being broken to favor one sector, it leads them to disengage from the management process and can reduce compliance, jeopardize data gathering, and create a host of other problems. Defendants' actions, therefore, are undermining the system Plaintiffs rely on.

7.    Plaintiffs request this Court declare that Defendants have violated the Magnuson-Stevens Act and the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ("APA"), by failing to implement the greater amberjack accountability measure at 50 C.F.R § 622.41(a)(2). Plaintiffs also request this Court enjoin Defendants to issue immediately a temporary rule implementing the same, so as to recover as much of the recreational overage from last year as possible, and further enjoin Defendants to pay back any amount caught this year in the following year.

## JURISDICTION AND VENUE

8.    The Court has jurisdiction over this case pursuant to the Magnuson-Stevens Act, which provides that the "district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the Act. 16 U.S.C. § 1861(d).

9.    The Magnuson-Stevens Act provides judicial review of regulations and fishery management actions as follows:

> (1) Regulations promulgated by the Secretary under this Act and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, [the APA], if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; . . .
>                . . .
> (2) The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.

*Id.* § 1855(f). Importantly, however, the Act does not address judicial review of agency inaction.

10.    Because the Magnuson-Stevens Act vests broad jurisdiction in the Federal district courts to hear "any case or controversy arising under" the Act, *id.* § 1861(d), and because it expressly provides for judicial review of final agency actions, *id.* § 1855(f), the Federal district courts have jurisdiction to hear agency inaction cases arising under the Act. *See*

*Telecommunications Research & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 74–79 (D.C. Cir. 1984) (noting courts may "resolve claims of unreasonable delay in order to protect [their] future jurisdiction" (citation omitted)).

11.    Subject matter jurisdiction is further provided by 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States," as well as 28 U.S.C. § 1361, which grants the district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

12.    Remedial jurisdiction for agency inaction claims is provided by Section 706(1) of the APA, which states that "reviewing court[s] shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *see also TRAC*, 750 F.2d at 79 ("Congress has instructed statutory review courts to compel agency action that has been unreasonably delayed." (citing 5 U.S.C. § 706(1))).

13.    In the alternative, remedial jurisdiction may provided by the All Writs Act, which permits Federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a); *see also TRAC*, 750 F.2d at 75 (noting the All Writs Act operates "in conjunction with" statutory grants of jurisdiction).

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (e)(1)(A)–(B), and 5 U.S.C. § 703, because Defendants reside in this judicial district, and because a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia.

## PARTIES

15.    Plaintiff Ariel Seafoods of Florida, Inc. ("Ariel Seafoods") is a corporation organized under the laws of Florida, with its principal place of business located in Destin, Florida. Ariel Seafoods is a seafood buyer and wholesaler, and in that capacity buys from around forty independently-owned fishing vessels that participate in Gulf fisheries. Among other species, Ariel Seafoods purchases greater amberjack caught in the Gulf. Ariel Seafoods also owns three federally-permitted fishing vessels that participate in the Gulf Reef Fish fishery and catch greater amberjack when the commercial season is open and deliver it to Ariel Seafoods' shoreside operations. Ariel Seafoods furthermore participates in the Gulf fishery management process through its owner and president, who attends fishery management council meetings, provides public comment, and advocates for sustainable commercial fishing.

16.    Plaintiff Jensen Tuna, LLC ("Jensen Tuna") is a limited liability company established under Louisiana state law, and located in Houma, Louisiana. Jensen Tuna is a seafood buyer and wholesaler, and in that capacity buys from a number of small family-run fishing boats—referred to as "bottom boats"—in Louisiana. Jensen Tuna has developed strong relationships with many of the boat owners and captains from which it buys fish, because fishing communities along the southern Louisiana coast are small and tightly knit. Because of its dependence on a modest number of bottom boats, Jensen Tuna generally must buy whatever is available and coming in to the dock; the company does not have the ability to rapidly change or diversify the portfolio of fish that it buys. Greater amberjack is one of the species of Gulf reef fish that Jensen Tuna buys from its partner boats. The owner and officers of Jensen Tuna furthermore participate in the federal fishery management process, by attending Council

meetings and providing public comment, tracking management developments, and coordinating with other fishermen and businesses on providing input to the Council.

17.     Plaintiff Water Street Seafood, Inc. ("Water Street") is a corporation organized under the laws of Florida, with its principal place of business located in Apalachicola, Florida. Water Street is a seafood buyer and distributor, and in that capacity buys fish caught in the Gulf from both independent fishing vessels and other fish dealers. Water Street sells fish to institutional buyers as well as retailers, and Water Street depends on the Gulf reef fish fishery to supply fresh, high-quality seafood for its customers. The fish bought and sold by Water Street include Gulf greater amberjack, which is subject to strong consumer demand and prior to the current restrictions on commercial catch, was an important part of Water Street's business operations.

18.     Plaintiff David Walker is a lifelong fisherman based out of Alabama. Walker has fished for over forty years in the Gulf, and has an extensive history with greater amberjack. He depends on greater amberjack among other reef fish stocks for his livelihood, and has been affected by the progressive cuts to commercial trip limits of greater amberjack in recent years as the stock has failed to rebuild. Walker understands that catch restrictions are necessary for the long-term rebuilding of the amberjack stock, and that healthy fish stocks are the foundation upon which his livelihood and identity rest. As a commercial fisherman who fishes with accountability and monitoring, and regularly stays within his limits, Walker depends on the integrity of the Gulf management system to ensure that other fishermen—commercial and recreational—do the same.

19.     There are several reasons why Plaintiffs have a stake in this matter.  First, all four Plaintiffs fundamentally rely for their existence on healthy stocks of fish in the Gulf, with corresponding healthy commercial fisheries. As stock health declines and commercial catch

levels are throttled back—as has happened repeatedly with greater amberjack over the years—Plaintiffs' business operations become less economically viable. So on a basic level, Plaintiffs have a strong interest in seeing the greater amberjack stock successfully rebuild. Only with a healthy population level and sustainable management do Plaintiffs have a long-term future.

20.     And in terms of sustainability, the overage incurred by the recreational sector for greater amberjack in the 2024-2025 season was significant:  Defendants' own numbers indicate 882,451 pounds were landed, while the recreational catch limit was only 404,000 pounds. This means the recreational sector caught over *twice its allotted amount* for the year.  The commercial sector stayed under its catch limit, but because the recreational sector is the predominant source of fishing mortality for greater amberjack, total landings (i.e., commercial and recreational combined) were still nearly twice the total annual catch limit.[1]

21.     As Defendants themselves have acknowledged, large overages like this must be recovered through "payback" the following year—meaning a corresponding reduction in the following year's catch to offset the overage—or else they will have ripple effects on stock health and the broader fishery. *See, e.g.*, 87 Fed. Reg. 44,027, 44,029 (July 25, 2022) (noting that an unrecovered overage of 400,000 pounds, which is what is at stake here, "could have serious conservation impacts including failure to meet the greater amberjack stock's rebuilding timeline of 2027, which could result in the need to further reduce catch levels and also could result in negative socio-economic effects in the long-term").

---

[1] Total landings of greater amberjack in 2024, meaning commercial and recreational combined, were 982,936 pounds, compared to a total annual catch limit of 505,000 pounds.

22.    A second and more specific reason why Plaintiffs are invested in this matter—the sustainability and proper management of Gulf greater amberjack—is that as fishermen and participants in the seafood distribution supply chain, Plaintiffs are constantly fighting to keep market share for their products. Retail and wholesale consumers demand seafood continuously, so to the extent a U.S.-caught product like Gulf amberjack becomes patchy and unavailable due to restricted commercial trip limits, consumers will substitute another fish for amberjack. This means buyers will substitute foreign-caught mahi (or perhaps tuna/swordfish or even tilapia depending on the use) when amberjack becomes unavailable. And once buyers have switched product, it is difficult to recover market share. This means Plaintiffs face something of a one-way ratchet in demand for their products: it is easy to lose market share, yet slow and painstaking (and sometimes even impossible) to regain it.

23.    Greater amberjack has been teetering for some years now on the edge of being viable as a product offering for Plaintiffs, because commercial harvest has been so restricted in the Gulf. For this reason, Plaintiffs feel a degree of urgency around restoring the health of the greater amberjack population and allowing commercial trip limits to increase. Unless this happens relatively soon, the species' market share will be lost permanently, and amberjack will be relegated to a niche market with substantially reduced demand.

24.    As explained above, allowing an unrecovered overage at the level inflicted last year can have serious consequences for stock rebuilding and long-term sustainability. This, for the reasons just mentioned, will negatively affect Plaintiffs' ability to offer greater amberjack as a stable product offering at any appreciable volume.

25.    A third reason Plaintiffs are invested in the sustainable and proper management of greater amberjack is because they rely on a strong fishery management system for their business

operations and their owners' livelihoods and identities. Plaintiffs and their owners are fishermen and fish dealers, and as such, they fundamentally need management to succeed.

26.    Fishery management relies critically on voluntary compliance on the water and stakeholder engagement with the management system, in order to succeed. There must be strong buy-in among participants, and this in turn requires participants to have a sense of fairness and of being heard. When institutional integrity starts to break down, and stakeholders lose confidence in the system, problems ensue. On-the-water compliance can drop, data gathering can become less reliable, political pressure can increase, and fishery management outcomes—rebuilding stocks and avoiding overfishing—can be compromised.

27.    Here, Defendants correctly applied the commercial accountability measure for greater amberjack at 50 C.F.R. § 622.41(a)(1)(i) on August 29, 2025, closing the commercial season as catch numbers indicated the sector catch limit was being reached.

28.    Three days later, however, Defendants withheld and failed to apply the recreational accountability measure for greater amberjack located just four subparagraphs away in the Code of Federal Regulations. This was not due to any staffing or capacity restrictions; on information and belief, NMFS Southeast Region sent the regulatory bundle up to headquarters well in advance of the September 1 deadline.

29.    It also was not an accident that the recreational sector benefited from Defendants' failure to follow the law. Both one-off actions and structural features of federal fishery management in the Southeast have reflected this orientation over the years. *See, e.g.*, 87 Fed. Reg. 74,014 (Dec. 2, 2022) (final rule after having allowed two full recreational red snapper seasons to proceed with known exceedances of the nominal recreational catch limit that went un-repaid); *Ocean Conservancy v. Ross*, No. 1:17-cv-1408 (D.D.C. complaint filed July 17, 2017)

(admittedly illegal extension of recreational fishing season for red snapper); 50 C.F.R. § 622.41 (setting annual catch limits and targets in terms of landings only, for a fishery in which the recreational sector is responsible for a substantial majority of all dead discards).

30.    Defendants' failure to apply regulations evenhandedly between the commercial and recreational sectors compromises the integrity of the fishery management process. As stakeholders watch the rules being broken to favor one sector, it leads them to disengage from the management process and rethink their degree of voluntary compliance. Notably, this can occur even among those who nominally benefit from the unequal treatment, as it furthers the impression that there is no accountability in the fishery. For these reasons, Defendants' arbitrary and illegal actions are undermining the management system, and in turn jeopardizing Plaintiffs' reliance on that management system for their business operations, livelihoods, and identities.

31.    Defendant NMFS is a federal agency within the Department of Commerce, with the responsibility of protecting and managing the fish, marine mammals, and other marine resources of the United States. NMFS has been delegated authority by the Secretary of Commerce to implement and enforce the Magnuson-Stevens Act, including approving fishery management plans and amendments to those plans, and promulgating implementing regulations. NMFS is the government agency primarily responsible for ensuring that the requirements of the Magnuson-Stevens Act are followed, and has, through the Secretary, "general responsibility to carry out any fishery management plan" approved under the Act. 16 U.S.C. § 1855(d). NMFS failed to issue a temporary rule implementing the mandatory payback provisions for the Gulf greater amberjack recreational fishery, located at 50 C.F.R. § 622.41(a)(2), prior to the start of the 2025-2026 recreational fishing season.

32.     Defendant Howard Lutnick ("Lutnick"), the United States Secretary of Commerce, is the highest-ranking official within the Department of Commerce and, in that official capacity, has formal responsibility for the administration and implementation of the Magnuson-Stevens Act, as well as for compliance with all other federal laws applicable to the Department of Commerce. Lutnick, through his designee NMFS, as described above, failed to issue a temporary rule implementing the mandatory payback provisions for the Gulf greater amberjack recreational fishery, located at 50 C.F.R. § 622.41(a)(2), prior to the start of the 2025-2026 recreational fishing season. He is sued in his official capacity.

## LEGAL BACKGROUND

**The Magnuson-Stevens Fishery Conservation and Management Act**

33.     Congress enacted the Magnuson-Stevens Act in 1976, in order "to conserve and manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1).

34.     The Act establishes eight Regional Fishery Management Councils, including the Gulf of Mexico Fishery Management Council, which manages fisheries in federal waters off North Carolina, South Carolina, Georgia, and the east coast of Florida. *Id.* § 1852(a)(1)(E).

35.     Councils are tasked with preparing fishery management plans and amendments for each fishery within their geographic areas of authority, *id.* § 1852(h)(1), as well as recommending regulations to implement such plans and amendments, *id.* § 1853(c).

36.     The Secretary of Commerce, acting through NMFS, reviews all submitted plans, plan amendments, and regulations, *id.* § 1854(a)–(b), and upon approval, promulgates regulations and otherwise implements the plans and plan amendments, *id.* §§ 1854(b)(3), 1855(d).

37.     The Act requires that all fishery management plans, plan amendments, and implementing regulations be consistent with ten "National Standards" for fishery conservation and management. *Id.* § 1851(a).

38.     National Standard 1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery . . . ." *Id.* § 1851(a)(1). Optimum yield in turn is defined by the Act as the amount of fish that "is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor," and "in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery." *Id.* § 1802(33)(C).

39.     The Act defines the terms "overfishing" and "overfished" to mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *Id.* § 1802(34). Regulatory guidelines promulgated by NMFS clarify that "overfishing" refers to the rate of removals from a fish stock (i.e., the act of fishing at an unsustainable rate), whereas "overfished" refers to when a stock's biomass or reproductive potential is below a level at which it can produce maximum sustainable yield on a continuing basis (i.e., the state of being depleted). *See* 50 C.F.R. § 600.310(e)(2)(i).

40.     Other National Standards address allocations, science, coordination, efficiency, contingency planning, costs, fishing communities, bycatch, and safety of human life at sea. *Id.* § 1851(a)(2)–(10).

41.     In addition to the National Standards, the Magnuson-Stevens Act provides direct requirements for fishery management plans. One such requirement is to "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the

fishery, including measures to ensure accountability." *Id.* § 1853(a)(15). That requirement was added to the Act in 2006, in response to chronic overfishing and a failure of managers to sustainably manage fish stocks for the first thirty years under the Act. *See* Pub. L. No. 109–479, § 104(a)(10), 120 Stat. 3575, 3584 (Jan. 12, 2007).

42.     Annual catch limits are numerical limits on the allowable catch for each fish stock, set every year at a level below the overfishing threshold. The idea is to set a science-based limit on allowable catch ahead of time, and stay accountable to that limit. This represented a radical change for many fisheries, which for decades had been managed with no meaningful accountability.

43.     Accountability in the context of catch limits means two things. First, managers must set measures that serve to constrain catch in the fishery to the catch limit, in a given year. This can take different forms—from individual quota programs to in-season catch monitoring and closures—but fundamentally it means stop fishing when you hit the catch limit for that year. *See, e.g.*, S. Rep. No. 109–229, at 21 (2006) ("The Committee expects that if a sector is likely to exceed its annual catch limit, the Council will restrict that sector's harvest to ensure the sector stays within its annual catch limit.")

44.     Regulations providing this form of accountability for Gulf greater amberjack are located at 50 C.F.R. § 622.41(a)(1)(i) and (2)(i) for the commercial and recreational sectors, respectively. There is no dispute in this case about whether Defendants have complied with these regulations, or this aspect of the statutorily-required accountability under 16 U.S.C. § 1853(a)(15).

45.     The second form of accountability under 16 U.S.C. § 1853(a)(15) is correcting for any overages that do occur. Sometimes, despite good-faith efforts to stop fishing before the catch

limit is hit, managers end up with an overage—a situation where more fish were caught in a given year than the catch limit allows for. In those situations, the statute requires managers to account for the overage from a conservation standpoint. For chronically overfished and rebuilding stocks like Gulf greater amberjack, this means "payback" of the overage amount. Specifically, the following year's catch limit is reduced by the amount necessary to recover, or account for, the overage.

46.    Regulations providing this form of accountability for Gulf greater amberjack are located at 50 C.F.R. § 622.41(a)(1)(ii) and (2)(ii) for the commercial and recreational sectors, respectively. The dispute in this case centers on Defendants' withholding of action under the latter of those—the recreational payback regulation.

47.    The requirement for annual catch limits and accountability measures was intended to finally operationalize the Act's long-standing mandate to prevent overfishing. This was stated directly in the text of the Act, which requires annual catch limits to be set "at a level such that overfishing does not occur, 16 U.S.C. § 1853(a)(15), and is underscored by the legislative history, *see, e.g.*, S. Rep. No. 109–229, at 6-7 (2006) (pointing out that "overfishing is still occurring in a number of fisheries, even those fisheries under a rebuilding plan," and stating "[t]he Committee intends that these annual catch limits, taken with the existing overfishing and rebuilding authorities, will ensure full compliance with the Magnuson-Stevens Act"). *Accord* 50 C.F.R. § 600.310(f)(4)(i) (NMFS reiterating in regulatory guidelines that annual catch limits "must prevent overfishing" when measured against a stock's status determination criteria).

48.    After 2006, overfishing rates across U.S. fisheries dropped significantly under the new annual catch limits mandate. As one court subsequently observed, the new legal mandate "fundamentally altered American fishing regulation by requiring [managers] to set hard, science-

based caps on how many fish could be caught each year and by demanding that accountability measures be triggered when fishermen exceeded those caps." *Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 266 (D.D.C. 2014) (citations omitted).

**The Administrative Procedure Act**

49.     The APA sets forth basic process requirements for federal rulemaking, including public notice and opportunity to comment on a proposed rule and required timelines for making a final rule effective. *See* 5 U.S.C. § 553. It also provides a cause of action in judicial review for "[any] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." *Id.* § 702.

50.     The APA defines "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act*." *Id.* § 551(13) (emphasis added). In judicial review of agency inaction, the APA instructs that "[t]he reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

51.     The Supreme Court has clarified that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original). "Discrete" actions are agency actions as enumerated under § 551(13), or a similar equivalent. *Id.* at 62–63. "Legally required" actions are those in which the agency's duty is specific and unequivocal, along the lines of what is required under traditional mandamus jurisprudence. *Id.* at 63–65.

## FACTUAL BACKGROUND

**Greater Amberjack and the Gulf Reef Fish Fishery**

52.    Greater amberjack (*Seriola dumerili*) is a large predatory fish found in the Gulf of Mexico, as well as in other areas of subtropical to temperate ocean worldwide. The species can grow to over six feet in length and 170 pounds, though most individuals caught in fisheries are smaller. Greater amberjack is a carnivore and opportunistic feeder, inhabiting pelagic and semi-pelagic waters and often preferring structure such as rocky outcrops, deep reefs, drop-offs, or wrecks. In terms of human use, greater amberjacks have been caught around the world for centuries. They are generally valued highly for their tender but firm flesh, which is somewhere between mahi and tuna in its flavor and texture.

53.    Greater amberjack are managed under the Fishery Management Plan for Reef Fish Resources, which was drafted in 1981 by the Gulf of Mexico Fishery Management Council ("the Council"). The Reef Fish plan governs 31 species, including various snappers, groupers, grunts, jacks, and tilefishes; its jurisdiction spans federal waters from the Mexico border to the southern tip of Florida. The plan has been amended numerous times since its initial adoption, and implementing regulations are located at 50 C.F.R. Part 622, Subpart B.

54.    The initial focus of the Reef Fish plan was on red snapper and regulating certain gear types, but within a few decades greater amberjack came into view. The stock was assessed at the turn of the millennium and found to be overfished—meaning the population size, measured as spawning stock biomass, was too low. *See* Stephen C. Turner et al., National Marine Fisheries Service, Stock Assessments of Gulf of Mexico Greater Amberjack Using Data through 1998, at 8-9 (July 2000).

55.     Based on the Turner et al. stock assessment, NMFS declared the Gulf of Mexico greater amberjack stock overfished in 2001. This triggered the need for a rebuilding plan, which was issued in the form of Secretarial Amendment 2 to the fishery management plan. Finalized in 2003, Secretarial Amendment 2 established a biomass-based target for rebuilding the greater amberjack population and a timeframe for rebuilding—according to which the stock was to be rebuilt by 2012. *See* Gulf of Mexico Fishery Management Council, Secretarial Amendment 2 to the Reef Fish Fishery Management Plan to Set Greater Amberjack Sustainable Fisheries Act Targets and Thresholds and to Set a Rebuilding Plan (Nov. 2002); 68 Fed. Reg. 39,898 (July 3, 2003) (final rule).

56.     While setting targets and goals, Secretarial Amendment 2 lacked any specific management measures or accountability for stock rebuilding, and unsurprisingly the stock did not rebuild. In 2006, greater amberjack was assessed for the first time by the Southeast Data, Assessment, and Review ("SEDAR") process. That assessment, referred to as SEDAR 9, found the stock continued to be overfished, and also was subject to overfishing—meaning fish were being removed from the population too rapidly. *See* Southeast Data, Assessment, and Review, Stock Assessment Report of SEDAR 9: Greater Amberjack (2006).

**Amendment 30A:  Annual Catch Limits and Accountability Measures**

57.     In response to SEDAR 9, the Council developed and NMFS approved Amendment 30A to the fishery management plan. This amendment, and its accompanying regulations, established annual catch limits and accountability measures for greater amberjack that were intended to allow for rebuilding by the original target date of 2012. *See* Gulf of Mexico Fishery Management Council, Final Reef Fish Amendment 30A: Greater Amberjack – Revise Rebuilding Plan, Accountability Measures; Gray Triggerfish – Establish Rebuilding Plan, End

Overfishing, Accountability Measures, Regional Management Thresholds and Benchmarks (Feb. 2008); 73 Fed. Reg. 38,139 (July 3, 2008) (final rule).

58.    Amendment 30A added to the Code of Federal Regulations an annual catch limit (referred to as a "quota" at that time) for greater amberjack, which was 503,000 pounds for the commercial sector and 1,368,000 pounds for the recreational sector. *See id.* at 38,143. Amendment 30A also for the first time added accountability measures for greater amberjack, meaning measures that function to both hold annual catch to the stated limit, and to repay overages in the event catch goes over the limit. *See generally supra* ¶¶43–46. The recreational sector payback provision from Amendment 30A, as established in 2008, read as follows:

> [I]f despite such closure, recreational landings exceed the quota, the AA will file a notification with the Office of the Federal Register, at or near the beginning of the following fishing year, to reduce the length of the recreational fishing season for the following fishing year by the amount necessary to recover the overage from the prior fishing year.

73 Fed. Reg. at 38,143. With minor modifications, this regulatory provision has remained in force through to the present day. *See infra* ¶¶61, 74.

59.    Despite the catch limit and accountability measures from Amendment 30A, the next stock assessment found greater amberjack stock continued to be overfished and subject to overfishing. *See* Southeast Data, Assessment, and Review, SEDAR 9 Stock Assessment Update Report: Gulf of Mexico Greater Amberjack (Feb. 2011).

**Subsequent Management Actions and Stock Assessments**

60.    In response to the SEDAR 9 Update assessment, the Council recommended and NMFS approved Amendment 35 to the Reef Fish fishery management plan. That amendment and its accompanying regulations reduced the annual catch limit for greater amberjack modestly, to 409,000 pounds for the commercial sector and 1,130,000 pounds for the recreational sector.

*See* 77 Fed. Reg. 67,574, 67,579 (Nov. 13, 2012); *see also* Gulf of Mexico Fishery Management Council, Final Amendment 35 to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico: Modifications to the Greater Amberjack Rebuilding Plan and Adjustments to the Recreational and Commercial Management Measures (May 2012).

61.     Amendment 35 also reorganized and updated the greater amberjack payback provision for the recreational sector, but its content remained the same:

> [I]f recreational landings, as estimated by [NMFS], exceed the recreational ACL [annual catch limit], as specified in paragraph (a)(1)(ii)(C) of this section, [NMFS] will file a notification with the Office of the Federal Register, at or near the beginning of the following fishing year to reduce the recreational ACT [annual catch target] (recreational quota) and the recreational ACL [annual catch limit] for that following year by the amount of any recreational ACL [annual catch limit] overage in the prior fishing year.

77 Fed. Reg. at 67,579.

62.     The next stock assessment, SEDAR 33, was completed in 2014. It once again showed the greater amberjack stock to be overfished (i.e., the spawning biomass was too low) and subject to overfishing (i.e., the rate of removals was too high). *See* Southeast Data, Assessment, and Review, SEDAR 33: Gulf of Mexico Greater Amberjack Stock Assessment Report (Mar. 2014).

63.     Because the greater amberjack stock had failed to rebuild within its original timeframe (by 2012), the Council developed and NMFS approved a framework action to revise the relevant catch limits and establish a new rebuilding date of 2019.  Framework actions are a form of action that is taken under the governing fishery management plan, which allows for a somewhat more abbreviated process. The framework action responding to SEDAR 33 was finalized in 2015, set the annual catch limit for greater amberjack at 464,000 pounds for the commercial sector and 1,255,600 pounds for the recreational sector. *See* 80 Fed. Reg. 75,432,

75,436 (Dec. 2, 2015); *see also* Gulf of Mexico Fishery Management Council, Framework

Action to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico:

Modifications to Greater Amberjack Allowable Harvest and Management Measures (July 2015).

The 2015 framework action did not change the payback provisions for greater amberjack in the

Code of Federal Regulations.

64.     The following year a stock assessment update was conducted, and once again it

found the Gulf greater amberjack stock to be overfished and subject to overfishing. *See*

Southeast Data, Assessment, and Review, SEDAR 33 Stock Assessment Update Report: Gulf of

Mexico Greater Amberjack (*Seriola dumerili*) (2016). The assessment update also found that the

stock would not be able to rebuild by the revised deadline of 2019.

65.     In response, the Council developed and NMFS approved another framework

action in 2017. Under the new framework action, annual catch limits were reduced modestly—to

a series of progressively increasing values starting at 319,140 pounds for the commercial sector

and 862,860 pounds for the recreational sector. *See* 82 Fed. Reg. 61,485, 61,487 (Dec. 28, 2017);

*see also* Gulf of Mexico Fishery Management Council, Final Framework Action to the Fishery

Management Plan for the Reef Fish Resources of the Gulf of Mexico: Modifications to Greater

Amberjack Allowable Harvest and Rebuilding Plan (Sept. 2017). A new deadline for rebuilding

was set, under which the stock would be rebuilt by 2027. No change was made to the

accountability measures for greater amberjack.

**Current Management:  SEDAR 70 and Amendment 54**

66.     In 2020, a new recent stock assessment—the most recent one to date—was

completed.  This assessment, SEDAR 70, showed yet again that greater amberjack was

overfished and subject to overfishing. *See* Southeast Data, Assessment, and Review, SEDAR 70

Stock Assessment Report: Gulf of Mexico Greater Amberjack (Oct. 2020). The new assessment did indicate the stock could rebuild by 2027, however, if catch levels were reduced.

67.     Because the Council did not have a fishery management plan or framework action ready for the 2022-2023 recreational fishing season, NMFS issued an emergency rule reducing the recreational open months to September and October (i.e., fall 2022), in order to bring down the amount of recreational catch. *See* 87 Fed. Reg. 44,027 (July 25, 2022); *see also* Gulf of Mexico Fishery Management Council, Emergency Action to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico: Emergency Action to Modify the Greater Amberjack Recreational Fixed Closed Season (July 2022).

68.     The next year, the Council adopted and NMFS approved Amendment 54 to the fishery management plan, which substantially reduced the greater amberjack annual catch limit in an attempt to meet the 2027 rebuilding deadline. Amendment 54 also recalculated the allocation ratio between the commercial and recreational sectors for greater amberjack, based on a changeover in recreational fishing data sources. Under the new annual catch limit from Amendment 54—which is currently in effect—the commercial sector receives 101,000 pounds of greater amberjack and the recreational sector receives 404,000 pounds. No changes were made to the accountability measures for greater amberjack. *See* 88 Fed. Reg. 39,193, 39,201 (June 15, 2023); *see also* Gulf of Mexico Fishery Management Council, Final Amendment 54 to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico: Modifications to the Greater Amberjack Rebuilding Plan, Catch Limits, and Sector Allocations (Jan. 2023).

**Catch Overages and the Importance of Paybacks**

69.     As should be clear from the management history above, NMFS and the Council have struggled to constrain the catch of greater amberjack over the years. The primary reason for

this is that recreational fishing is responsible for a substantial portion of the total catch, and unlike commercial vessels, recreational fishermen do not have mandatory reporting and effective in-season management. Recreational fishing effort and catch rates are hard to predict ahead of time, so a given recreational open season can yield a wide range of possible catch levels; managers only find out the result later, after the season is closed and estimates are compiled.

70.    In fishery management terminology, this dynamic is known as "management uncertainty." The actual effects of a given management action are only understood to a rough degree ahead of time, and by the time more precise information arrives, it is too late to affect the fishing on the water. *See* 50 C.F.R. § 600.310(f)(1)(v) (NMFS regulatory guidelines, defining management uncertainty). Recreational fisheries often have high management uncertainty, given the large number of participants and diffuse nature of the fishing activity.

71.    In situations with high management uncertainty, it becomes critical to provide both buffers and paybacks. *See id.* § 600.310(g) (accountability measures). Buffers are reductions taken from a management quantity like a quota or catch limit, meant to allow for some imprecision in outcomes. If it is difficult to control a fishery, essentially, then managers must aim at a point that is slightly lower than the actual annual catch limit. Doing so provides for the possibility that actual catch ends up being higher than expected. Annual catch targets are used for this purpose. *See id.* § 600.310(g)(4). NMFS and the Council have provided annual catch targets for greater amberjack in the governing regulations. *See* 50 C.F.R. §§ 622.39(a)(1)(v), (a)(2)(ii), 622.41(a)(1)(i), (2)(i).

72.    The other method for dealing with high management uncertainty is paybacks. The concept is simple: if catch exceeds the limit in Year 1, managers reduce the Year 2 limit by a corresponding amount to recover the overage. *See* 50 C.F.R. § 600.310(g)(3) (discussing

paybacks under the terminology of "overage adjustments"). Paybacks are important, especially in fisheries with the highest levels of management uncertainty, because even with appropriate buffers a fishery may still exceed the relevant catch limit. Paybacks allow for those overages to be recovered, and thus for overall catch on the stock to stay within the prescribed limits. NMFS and the Council have provided payback regulations for greater amberjack, which are located at 50 C.F.R § 622.41(a)(1)(ii), (2)(ii).

73.    Buffers and paybacks are even more important in situations where a stock is rebuilding or subject to overfishing—both of which are true for Gulf greater amberjack. Catch overages in these situations often have a larger impact on both the fish population and the human fishery, compared to overages for healthy stocks. *See, e.g.*, 87 Fed. Reg. at 44,029 (noting "serious conservation impacts" from catch overages for greater amberjack, as well as "negative socio-economic effects in the long-term"). Thus it becomes a higher priority to avoid such overages (via use of buffers) and to recover them when they do occur (via use of paybacks).

**The Routine and Mandatory Nature of Paybacks**

74.    Turning to the payback provisions for greater amberjack, the current regulatory language comes from Amendment 35 in 2012. *See supra* ¶61. After a few minor changes for reorganization purposes in the intervening years, the text now reads as follows:

> [I]f recreational landings, as estimated by [NMFS], exceed the recreational ACL [annual catch limit], as specified in paragraph (a)(2)(iii) of this section, [NMFS] will file a notification with the Office of the Federal Register, at or near the beginning of the following fishing year to reduce the recreational ACT [annual catch target] (recreational quota) and the recreational ACL [annual catch limit] for that following year by the amount of any recreational overage in the prior fishing year.

50 C.F.R. § 622.41(a)(2)(ii).

75.     The way paybacks work in practice is precisely what the regulatory text says: NMFS finalizes its sector landings estimates for the prior year, and if landings exceeded the relevant catch limit, the agency publishes a temporary rule in the Federal Register adjusting the sector's annual catch limit and season length for the following year. This occurs somewhat regularly with greater amberjack, for both recreational and commercial sectors. *See, e.g.*, 88 Fed. Reg. 80,995 (Nov. 21, 2023) (commercial payback); 84 Fed. Reg. 22,073 (May 16, 2019) (commercial payback); 82 Fed. Reg. 14,477 (Mar. 21, 2017) (recreational payback); 81 Fed. Reg. 48,719 (July 26, 2016) (recreational payback); 79 Fed. Reg. 22,594 (Apr. 23, 2014) (recreational payback); 78 Fed. Reg. 13,284 (Feb. 27, 2013) (commercial payback); 77 Fed. Reg. 19,563 (Apr. 2, 2012) (commercial payback); 76 Fed. Reg. 23,909 (Apr. 29, 2011) (recreational and commercial payback); 75 Fed. Reg. 35,335 (June 22, 2010) (recreational and commercial payback).

76.     Paybacks are a routine matter, dealt with via promulgation of a temporary rule. Public comment is waived, because the action is merely implementing a substantive decision that was made elsewhere—specifically, in Amendment 30A and recodified in Amendment 35. *See, e.g.*, *id.* at 35,336 ("The final rule for Amendment 30A implementing these AMs [accountability measures] was subject to notice and comment, and all that remains is to notify the public of the 2010 commercial quota and season length for the 2010 recreational fishing season."); 88 Fed. Reg. at 80,995 (finding public comment "unnecessary because the regulations associated with the commercial AM [accountability measure] and the commercial ACL [annual catch limit] and ACT [annual catch target] reductions have already been subject to notice and public comment, and all that remains is to notify the public of the updated commercial ACL [annual catch limit] and ACT [annual catch target] for the 2024 fishing year."

77.    In case the regulatory structure alone does not make it clear that paybacks are mandatory—rather than a matter of agency discretion or policy preference—NMFS itself has confirmed the mandatory nature of paybacks numerous times. *See, e.g., id.* ("*This action is required* by 50 CFR 622.41(a)(1)(ii), which was issued pursuant to section 304(b) of the Magnuson-Stevens Act . . . ." (emphasis added); 84 Fed. Reg. at 22,073 ("Under 50 CFR 622.41(a)(1)(ii), *NMFS is required* to reduce the commercial ACL [annual catch limit] and the commercial ACT [annual catch target] for greater amberjack in the year following an overage of the commercial ACL [annual catch limit], by the amount of the overage."); 82 Fed. Reg. at 14,477 (same but for recreational sector and referencing 50 C.F.R. 622.41(a)(2)(ii) rather than (a)(1)(ii)); 75 Fed. Reg. at 35,336 ("Given the *legal obligation* for NMFS to announce the duration of recreational season in a timely manner, it is important this announcement be made as soon as possible . . . ." (emphasis added)).

78.    The last thing to understand about paybacks is that they must be issued early enough to enable full recovery of the overage amount (up to the total annual catch limit for the coming year). What this means is if only a small amount of payback is necessary, there is more temporal flexibility; the temporary rule merely needs to come out in time for the adjusted (slightly earlier) closure of the relevant season. But if a large amount of payback is necessary, like zeroing out the entire annual catch limit for the coming year, there is less temporal flexibility; the temporary rule must come out before the upcoming season has begun. If this does not occur, then current-year fishing will commence and the opportunity to recover the full year's annual catch limit is lost. This timing aspect is what is being referenced, when the regulatory language states that the Federal Register notice applying payback must come out "at or near the beginning of the following fishing year." 50 C.F.R. § 622.41(a)(2)(ii).

**The 2024-2025 Recreational Fishing Season and Defendants' Failure to Apply Payback**

79.     The 2024-2025 recreational season for greater amberjack was open from September 1 to October 31, 2024. The recreational annual catch limit for this fishing year was 404,000 pounds, as established in Amendment 54. *See* 50 C.F.R. § 622.41(a)(2)(iii).

80.     After the season closed, NMFS found that the recreational sector had landed over twice its allotted amount during the 2024-2025 season—around 880,000 pounds. *See* NOAA Fisheries, 2024 and 2025 Gulf of America Recreational Landings and Annual Catch Limits (ACLs) and Annual Catch Targets (ACTs), https://www.fisheries.noaa.gov/southeast/recreational-fishing/2024-and-2025-gulf-america-recreational-landings-and-annual-catch (updated Sept. 3, 2025) (reflecting a total amount of landed greater amberjack of 882,451 pounds); *see also id.* (updated Aug. 18, 2025) (showing an earlier value of 877,334 pounds).

81.     On information and belief, the NMFS Southeast Regional Office prepared the paperwork for a recreational payback, per usual, and sent it to NMFS headquarters with ample time to spare—early, in fact.

82.     Despite everything being set for the temporary rule applying payback, no such temporary rule was published in the Federal Register during August 2025.

83.     Stakeholders and the Council began to have questions about whether the temporary rule was, as August wore on. Concern was warranted because the 2025-2026 recreational annual catch limit would have to be fully zeroed out, given the large size of the prior year overage, and this meant the temporary rule would have to be published and effective before September 1, 2025.

84.     At its August meeting, the Council unanimously voted to "draft and transmit a letter to the NOAA Fisheries Assistant Administrator expressing the Council's concern that the

agency has not yet finalized the rulemaking for greater amberjack management measures in federal waters of the Gulf of America, despite requirements under the Magnuson-Stevens Act to implement accountability measures when catch limits are exceeded. The letter should inquire about: (1) the reason for the delay in finalizing the rule, (2) the expected timeline for publication and implementation, and (3) how NOAA Fisheries intends to ensure compliance with the accountability measure requirements that mandate adjustments to prevent overfishing, account for overages and ensure continued progress on rebuilding." Gulf Council Motions Report at 8, *available at* https://gulf-council-media.s3.amazonaws.com/uploads/2025/09/GC_Motions-Report_Aug2025-FINAL.pdf.

85.    No temporary rule applying payback was published by September 1, 2025, and as such, the recreational greater amberjack season opened under the default season opening provisions at 50 C.F.R. § 622.34(c). *See, e.g.*, Gulf Council Facebook post (appended as Exhibit 1) ("UPDATE: We haven't gotten a closure notice from NOAA for recreational greater amberjack season. That means the season defaults to OPEN for now. We will let you know if we hear anything different.").

86.    On September 3, 2025, the Council transmitted its letter to NMFS regarding the greater amberjack situation. In the letter, the Council reprinted the relevant portion of the Code of Federal Regulations, observed that the estimated recreational greater amberjack landings in 2024-2025 were 877,334 pounds (per the earlier version of the website cited above), and pointed out that this meant the recreational sector had caught 217 percent of its available limit for that year. *See* Letter from Jonathan Dugas, Council Chair, Gulf Council, to Eugenio Piñeiro Soler, Assistant Administrator, National Marine Fisheries Service, dated Sept. 3, 2025 (appended as Exhibit 2).

87.    As the Council noted in its letter, "this overage automatically triggers a reduction in the 2025 recreational ACL [annual catch limit]," and because the overage was so large, it "results in a complete recreational fishing closure in 2025." *Id.* at 1.

88.    The Council further explained: "The Council is concerned about annually exceeding the ACL for greater amberjack as it is currently in an overfished status with a long-term rebuilding plan. Therefore, the Council is troubled about NOAA Fisheries' lack of compliance with the recreational greater amberjack accountably measures defined in the codified federal regulations and respectfully requests an explanation. Additionally, the Council requests an explanation for the delayed rulemaking, a timeline for implementation, and a plan for ensuring compliance in the future. Accountability measures are designed in part to correct quantifiable imbalances in realized catch against defined catch limits, with the purpose of ensuring the continued sustainability of a fish stock or complex. If accountability measures are not implemented as prescribed in the codified federal regulations, then it is possible that the continued sustainability of a fish stock or complex would be jeopardized. Further, a lack of enforcement of these accountability measures erodes public confidence in the federal fisheries management system." *Id.* at 2.

89.    On information and belief, NMFS has not responded to the Council.

90.    The Federal Register reflects no temporary rule (or other form of notice) issuing to date, to apply accountability measures to the 2025-2026 recreational Gulf greater amberjack season.

91.    The 2025-2026 recreational greater amberjack season remains open, and fish are being caught and landed as of the date of this Complaint.

**CLAIM FOR RELIEF:**

**DEFENDANTS HAVE WITHHELD UNLAWFULLY A TEMPORARY RULE APPLYING THE ACCOUNTABILITY MEASURE AT 50 C.F.R. § 622.41(a)(2)(ii) TO THE GULF RECREATIONAL GREATER AMBERJACK FISHERY**

92.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

93.    The 2024-2025 recreational season for Gulf greater amberjack resulted in over twice the amount of landings allowed under the annual catch limit for that year.

94.    Regulations establishing accountability measures for Gulf greater amberjack provide for payback of any overages in the following fishing year, by reducing that year's annual catch limit by an amount corresponding to the prior year overage (up to the full amount of the annual catch limit for the new fishing year).  50 C.F.R. § 622.41(a)(2)(ii).

95.    The accountability measure regulations were promulgated as part of Amendment 35 to the Reef Fish fishery management plan (and a similar previous version as part of Amendment 30A to the plan).

96.    Defendants have a duty to "carry out any fishery management plan or amendment" that has been approved under the Magnuson-Stevens Act.  16 U.S.C. § 1855(d).

97.    Defendants did not and have not to date "file[d] a notification with the Office of the Federal Register, at or near the beginning of the following fishing year to reduce the . . . recreational ACL [annual catch limit] for that following year by the amount of any recreational overage in the prior fishing year," for Gulf greater amberjack. 50 C.F.R. § 622.42(a)(2)(ii).

98.    The payback regulation are specific and non-discretionary, as Defendants have repeatedly acknowledged. 50 C.F.R. § 622.41(a)(2)(ii); *see also supra* ¶¶74-78.

99.    Defendants' duty under the Act and the governing regulations to adjust the 2025-2026 recreational greater amberjack annual catch limit and season to account for the prior year overage is both discrete and mandatory, within the meaning of *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).

100.    Judicial review under Section 706(1) of the APA allows this Court to compel agency action that has been unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

101.    The nature of Defendants' duty here is such that strict enforcement is appropriate. The time for application of the accountability measure was "at or near the beginning of the [] fishing year," 50 C.F.R. § 622.41(a)(2)(ii), which was September 1 of this year.

102.    The regulation specifies this time frame for a reason:  paybacks must be applied before the window closes for recovering the necessary amount of fish. In a situation where the prior year's overage exceeds the annual catch limit for the new year, the new year's season must be cancelled fully, and as a result the payback regulations must be applied before the season begins. *See supra* ¶78.

103.    Because of the functional need for action before the fishing season begins in situations of large overages, Defendants' failure to issue a temporary rule implementing 50 C.F.R. § 622.41(a)(2)(ii) prior to September 1, 2025, constitutes action "unlawfully withheld" under 5 U.S.C. § 706(1), and analysis under the *TRAC* factors should not be necessary. To the extent the Court deems analysis under the *TRAC* factors necessary, that analysis leads to the conclusion that action has been "unreasonably delayed" here. *TRAC*, 750 F.2d at 80.

104.    For these reasons, Defendants have violated the APA and the Magnuson-Stevens Act, and their legal violations have harmed and will continue to harm Plaintiffs until they are remedied by this Court.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that this Court:

1.    Declare that Defendants violated the Magnuson-Stevens Act and the APA as described above by failing to apply the required accountability measure at 50 C.F.R. § 622.41(a)(2)(ii) by September 1, 2025;

2.    Order and enjoin Defendants to promulgate immediately a temporary rule, as is ordinarily done in these situations, and through that temporary rule apply the accountability measure at 50 C.F.R. § 622.41(a)(2)(ii).

3.    Order and enjoin Defendants to deduct from the recreational annual catch limit for the 2026-2027 season an amount of pounds corresponding to the agency's estimate of the amount of greater amberjack that is landed during the current (i.e., presently underway) recreational 2025-2026 season;

4.    Maintain jurisdiction over this action until Defendants are in compliance with the Magnuson-Stevens Act and the APA, and every order of this Court;

5.    Award Plaintiffs attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

6.    Provide Plaintiff such additional and further relief as may be appropriate.


Dated:  September 10, 2025            Respectfully submitted,

/s/ Seth Atkinson
Seth L. Atkinson (Bar ID CA00190)
Quillback Consulting
348 Nobel Drive
Santa Cruz, CA 95060
(203) 331-2792
seth@quillbackconsulting.com

*Attorney for Plaintiffs*