**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————————— )<br>ARIEL SEAFOODS OF FLORIDA, INC., )<br>JENSEN TUNA, LLC, WATER STREET )<br>SEAFOOD, INC., and DAVID WALKER )<br> )<br>       *Plaintiffs* )<br> )<br>       v. )<br> )<br>NATIONAL MARINE FISHERIES SERVICE, )<br>and HOWARD LUTNICK, in his official capacity )<br>as Secretary of Commerce, )<br> )<br>       *Defendants* )<br> )<br>———————————————————— ) | Civil Action No. 25-cv-3117 |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

STATUTORY AND REGULATORY CONTEXT ............................................................... 3

    I.    The Magnuson-Stevens Fishery Conservation and Management Act ......................... 3

        A.    Annual Catch Limits and Accountability ............................................... 4

    II.    The Administrative Procedure Act ......................................................................... 6

FACTUAL CONTEXT ......................................................................................................... 7

    I.    A History of Struggling to Rebuild Greater Amberjack ........................................... 7

    II.    The Importance of Paybacks in Ensuring Accountability ......................................... 8

    III.    50 C.F.R. § 622.41(a): Routine and Mandatory Paybacks for
Greater Amberjack ............................................................................................... 10

    IV.    Defendants' Arbitrary Failure to Apply Payback for the 2024-2025 Overage .......... 12

STANDARD OF REVIEW ................................................................................................. 15

ARGUMENT ....................................................................................................................... 16

    I.    Plaintiffs Are Likely to Succeed on the Merits ...................................................... 17

        A.    APA Review Is Available in Situations Not Covered by 16 U.S.C. § 1855(f) .... 17

        B.    Defendants' Duty to Apply the Greater Amberjack Accountability
Measure at 50 C.F.R. § 622.41(a)(2)(ii) Is Discrete ............................................ 20

        C.    Defendants' Duty to Apply the Greater Amberjack Accountability
Measure at 50 C.F.R. § 622.41(a)(2)(ii) Is Non-Discretionary ........................... 21

        D.    Action Has Been Unlawfully Withheld or Unreasonably Delayed
Under the *TRAC* Framework ............................................................................. 23

i

II.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief............................ 26

    A.    Defendants' Inaction Is Reallocating Greater Amberjack Away From the Commercial Sector........................................................................................... 27

    B.    Defendants' Inaction Damages the Gulf Fishery Management System, Upon Which Commercial Fishermen Depend..................................................... 29

    C.    Defendants' Inaction Harms the Greater Amberjack Stock, With Which Plaintiffs' Lives Are Intertwined....................................................... 33

III.    The Balance of Equities and Public Interest Favor Injunctive Relief........................ 37

CONCLUSION.......................................................................................................................... 38

## INTRODUCTION

This case challenges the failure of Defendants National Marine Fisheries Service ("NMFS") and Howard Lutnick (in his official capacity as Secretary of Commerce) to apply a mandatory accountability measure for Gulf greater amberjack, which should have reduced the recreational annual catch limit for the 2025-2026 fishing year to zero as a consequence for a large catch overage that occurred in the prior fishing year. The accountability measure is required under governing regulations at 50 C.F.R. § 622.41(a)(2), which were duly promulgated under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1891d ("Magnuson-Stevens Act" or "the Act").

Defendants have a discrete and mandatory duty to implement the regulation in question, as they are expressly tasked with implementing fishery management plans and amendments adopted under the Act. The regulatory text at 50 C.F.R. § 622.41(a)(2), moreover, was duly promulgated as part of an amendment to the Gulf Reef Fish Fishery Management Plan, and the provisions are specific and non-discretionary.

Defendants' failure to implement the regulations at 50 C.F.R. § 622.41(a)(2) is—right now—allowing the recreational fishing season for greater amberjack to proceed illegally. The default recreational season in the Gulf runs from September 1 to October 31, unless modified by an accountability measure. This year, Defendants arbitrarily withheld the required accountability measure, which would have served to close the recreational season entirely—because the catch overage from last year was greater than the annual catch limit for this year. By withholding the accountability measure, Defendants allowed recreational fishing for greater amberjack to commence on September 1, 2025.  Fishing is currently underway, and every fish that is caught reduces Defendants' ability to recover and repay the overage from last season.

The purpose of the accountability measure at 50 C.F.R. § 622.41(a)(2) is to safeguard the health of the Gulf greater amberjack stock. This stock of fish has been under a rebuilding plan for over two decades, and has chronically struggled to make progress. Overages like the one that occurred last year—where the recreational sector caught more than double its allowed limit—harm the greater amberjack stock and reduce its chances of rebuilding successfully, unless they are "paid back" in the following year as required by the regulations.

Plaintiffs Ariel Seafoods of Florida, Inc., Jensen Tuna, LLC, Water Street Seafood, Inc., and David Walker are companies and an individual engaged in commercial fishing as well as buying, processing, and selling commercially-caught fish. Plaintiffs' business operations depend on greater amberjack, among other stocks in the Gulf Reef Fish fishery. Greater amberjack rebuilding is important to Plaintiffs; as fishing-dependent businesses and individuals, their futures depend on sustainable fisheries and healthy fish stocks.

Plaintiffs, individually and through their owners and officers, also are long-time participants in the federal fishery management process. They know that their businesses and identities as fishermen and fish dealers depend on the Gulf fishery management system. Here, the commercial amberjack season was shut down on August 29, 2025—correctly and in accordance with the accountability measure at 50 C.F.R. § 622.41(a)(1)(i)—yet three days later, the recreational sector arbitrarily was allowed to proceed with an illegal season. This kind of occurrence undermines the integrity of the fishery management process. As stakeholders watch the rules being broken to favor one sector, it leads them to disengage from the management process and can reduce compliance, jeopardize data gathering, and create a host of other problems. Defendants' actions, therefore, are eroding the system that allows Plaintiffs to safely and reliably pursue their livelihoods.

Plaintiffs have no choice but to seek equitable relief, as the damage from Defendants' action is currently underway. If this case were to proceed via ordinary summary judgment motions, the recreational season for Gulf greater amberjack would be long gone by the time the matter were decided. Plaintiffs seek a temporary restraining order and/or preliminary injunction compelling Defendants to apply immediately the accountability measure at 50 C.F.R § 622.41(a)(2), and for the reasons set forth below Plaintiffs meet the legal standard for preliminary relief.

## STATUTORY AND REGULATORY CONTEXT

### I.    The Magnuson-Stevens Fishery Conservation and Management Act

Congress enacted the Magnuson-Stevens Fishery Act in 1976, in order "to conserve and manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1). The Act establishes eight Regional Fishery Management Councils, including the Gulf of Mexico Fishery Management Council ("the Council"), which has jurisdiction over fisheries in federal waters off Texas, Louisiana, Mississippi, Alabama, and the west coast of Florida. *Id.* § 1852(a)(1)(E).

Under the Act, Councils are tasked with preparing fishery management plans and amendments for each fishery within their geographic areas of authority, *id.* § 1852(h)(1), and with recommending regulations to implement such plans and amendments, *id.* § 1853(c). The Secretary of Commerce, acting through NMFS, reviews all submitted plans, plan amendments, and regulations, *id.* § 1854(a)–(b), and upon approval, promulgates regulations and otherwise implements the plans and plan amendments, *id.* §§ 1854(b)(3), 1855(d).

Fishery management plans must satisfy certain statutory requirements, including to "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." *Id.* § 1853(a)(15). This requirement was added in 2006, in response to chronic overfishing and a failure of managers to sustainably manage fish stocks for the first thirty years under the Act. *See* Pub. L. No. 109–479, § 104(a)(10), 120 Stat. 3575, 3584 (Jan. 12, 2007); S. Rep. No. 109–229 (2006).

## A.    Annual Catch Limits and Accountability

Annual catch limits are numerical limits on the allowable catch for each fish stock, set every year at a level below the overfishing threshold. *See* 50 C.F.R. § 600.310(f)(1)(iii). The idea is to set a science-based limit on allowable catch ahead of time, and stay accountable to that limit. This represented a radical change for many fisheries, which for decades had been managed with no meaningful accountability. S. Rep. No. 109-229, at 6-7.

Accountability in the context of catch limits means two things. First, managers must set measures that serve to constrain catch in the fishery to the catch limit, in a given year. This can take different forms—from individual quota programs to in-season catch monitoring and closures—but fundamentally it means stop fishing when you hit the catch limit for that year. *See, e.g.*, S. Rep. No. 109–229, at 21 ("The Committee expects that if a sector is likely to exceed its annual catch limit, the Council will restrict that sector's harvest to ensure the sector stays within its annual catch limit.").

Regulations providing this form of accountability for Gulf greater amberjack are located at 50 C.F.R. § 622.41(a)(1)(i) and (2)(i) for the commercial and recreational sectors. There is no dispute in this case about whether Defendants have complied with these regulations, or this aspect of the statutorily-required accountability under 16 U.S.C. § 1853(a)(15).

The second form of accountability under 16 U.S.C. § 1853(a)(15) is correcting for any overages that do occur. Sometimes, despite good-faith efforts to stop fishing before the catch limit is hit, managers end up with an overage—a situation where more fish were caught in a given year than the catch limit allows for. In those situations, the statute requires managers to account for the overage from a conservation standpoint. *See* 50 C.F.R. § 600.310(g)(1). For chronically overfished and rebuilding stocks like Gulf greater amberjack, this means "payback" of the overage amount:  the following year's catch limit is reduced by the amount necessary to recover, or account for, the overage.

Regulations providing this form of accountability for Gulf greater amberjack are located at 50 C.F.R. § 622.41(a)(1)(ii) and (2)(ii) for the commercial and recreational sectors, respectively. The dispute in this case centers on Defendants' withholding of action under the latter of those—the recreational payback regulation.

The requirement for annual catch limits and accountability measures was intended to finally operationalize the Act's long-standing mandate to prevent overfishing. This was stated directly in the text of the Act, which requires annual catch limits to be set "at a level such that overfishing does not occur, 16 U.S.C. § 1853(a)(15), and is underscored by the legislative history, *see, e.g.*, S. Rep. No. 109–229, at 6-7 (pointing out that "overfishing is still occurring in a number of fisheries, even those fisheries under a rebuilding plan," and stating "[t]he Committee intends that these annual catch limits, taken with the existing overfishing and rebuilding authorities, will ensure full compliance with the Magnuson-Stevens Act"). *Accord* 50 C.F.R. § 600.310(f)(4)(i) (NMFS reiterating in regulatory guidelines that annual catch limits "must prevent overfishing" when measured against a stock's status determination criteria).

After 2006, overfishing rates across U.S. fisheries dropped significantly under the new annual catch limits mandate. As one court subsequently observed, the new legal mandate "fundamentally altered American fishing regulation by requiring [managers] to set hard, science-based caps on how many fish could be caught each year and by demanding that accountability measures be triggered when fishermen exceeded those caps." *Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 266 (D.D.C. 2014) (citations omitted).

## II.    The Administrative Procedure Act

The APA sets forth basic requirements for federal rulemaking, including public notice and opportunity to comment on a proposed rule and required timelines for making a final rule effective. *See* 5 U.S.C. §§ 551–59. The APA also grants the right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." *Id.* § 702.

The APA defines "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act*." *Id*. § 551(13) (emphasis added). In judicial review of agency inaction, the APA instructs that "[t]he reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

The Supreme Court has clarified that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original). "Discrete" actions are agency actions as enumerated under § 551(13), or a similar equivalent. *Id.* at 62–63. "Legally required" actions are those in which the agency's duty is specific and unequivocal, like what is required under traditional mandamus jurisprudence. *Id.* at 63–65.

## FACTUAL CONTEXT

Greater amberjack (*Seriola dumerili*) is a large predatory fish found in the Gulf of Mexico, as well as in other areas of subtropical to temperate ocean worldwide. The species is managed in the Gulf under the Fishery Management Plan for Reef Fish Resources, which was drafted by the Council in 1981. The Reef Fish plan governs 31 species, including various snappers, groupers, grunts, jacks, and tilefishes; its jurisdiction spans federal waters from the Mexico border to the southern tip of Florida. The plan has been amended numerous times since its initial adoption, and implementing regulations are located at 50 C.F.R. Part 622, Subpart B.

## I.    A History of Struggling to Rebuild Greater Amberjack

Every time scientists have conducted a stock assessment of Gulf greater amberjack since the year 2000, they have concluded the stock is both subject to overfishing and overfished. Overfishing means fish are being removed from the population too quickly (i.e., the rate of removal is too high), whereas overfished means the population is at an unsustainably low level (i.e., biomass or abundance is too low). *See* 50 C.F.R. § 600.310(e)(2)(i)(B), (E).

The first rebuilding plan for greater amberjack in the Gulf was established in 2003, and it set a deadline of 2012 for rebuilding the stock. *See* 68 Fed. Reg. 39,898 (July 3, 2003) (final rule for Secretarial Amendment 2). Stock assessments continued to find amberjack subject to overfishing and overfished, however, even after the rebuilding plan was in place.

In 2008, the Council recommended and NMFS approved Amendment 30A to the fishery management plan, which established catch limits and accountability measures for the fishery. *See* 73 Fed. Reg. 38,139 (July 3, 2008). Amendment 30A specifically provided a payback requirement for quota overages by either sector—commercial or recreational—in the following fishing year. *Id.* at 38,143

For the next fifteen years, the Council and NMFS went through repeated cycles of stock assessments finding amberjack overfished and subject to overfishing, and reducing the catch limits. *See* 77 Fed. Reg. 67,574 (Nov. 13, 2012) (Amendment 35 final rule reducing catch limits); 80 Fed. Reg. 75,432 (Dec. 2, 2015) (framework action reducing catch limits and pushing out deadline for rebuilding); 82 Fed. Reg. 61,485 (Dec. 28, 2017) (framework action reducing catch limits and pushing out rebuilding deadline yet again); 88 Fed. Reg. 39,193 (June 15, 2023) (Amendment 54 final rule reducing catch limits further). *See generally* Complaint, ECF No. 1, at ¶¶60-68 (detailing management history).

## II.    The Importance of Paybacks in Ensuring Accountability

As reflected by the stock assessments, NMFS and the Council have struggled to constrain the catch of greater amberjack over the years. With an open-access recreational sector and trip-limit commercial management, it can be difficult to ensure that catch comes in precisely at or below the annual catch limit. This is particularly the case with recreational fisheries, which do not have mandatory reporting or effective in-season catch tracking. Recreational fishing effort and catch rates are hard to predict ahead of time, and they are subject to large fluctuations. A given recreational season length can yield a wide range of catch levels, and managers only find out the result later—after the season is closed and estimates are compiled.

In fishery management terminology, this dynamic is known as "management uncertainty." *See* 50 C.F.R. § 600.310(f)(1)(v) (NMFS regulatory guidelines).The actual effects of a management action are only understood to a rough degree ahead of time, and by the time more precise information arrives, it is often too late to affect fishing on the water.

When a fishery has high management uncertainty, it becomes critical to provide both buffers and paybacks in order to keep actual catch accountable to the limit. *See id.* § 600.310(g)

(accountability measures). Buffers are initial reductions taken from a catch limit, to allow space for some imprecision in outcomes. Essentially, if it is difficult to control a fishery, then managers should aim for a point slightly lower than the actual catch limit. This gives some flexibility so that the limit is not immediately exceeded, if actual catch ends up being higher than expected. Annual catch targets (sometimes called ACTs) are used for this purpose. *See id.* § 600.310(g)(4). NMFS and the Council have provided annual catch targets for greater amberjack in the governing regulations. *See* 50 C.F.R. §§ 622.39(a)(1)(v), (a)(2)(ii), 622.41(a)(1)(i), (2)(i).

The other method for dealing with high management uncertainty is paybacks. The concept is simple: if catch exceeds the limit in Year 1, managers reduce the limit in Year 2 by a corresponding amount to recover the overage. *See* 50 C.F.R. § 600.310(g)(3) (discussing paybacks, or "overage adjustments"). Paybacks are important, especially in fisheries with the highest levels of management uncertainty, since even with appropriate buffers a fishery may still exceed the relevant catch limit. Paybacks allow for those overages to be recovered, and thus for actual catch to stay within the planned trajectory over time. NMFS and the Council provided payback regulations for greater amberjack originally in Amendment 30A, as mentioned above, and the current regulations are located at 50 C.F.R § 622.41(a)(1)(ii), (2)(ii).

Buffers and paybacks are especially important in situations where a stock is rebuilding or subject to overfishing—both of which are true for Gulf greater amberjack. Catch overages in these situations tend to have a larger impact on both the fish population and the human dimensions of the fishery, compared to catch overages for healthy stocks. *See, e.g.*, 87 Fed. Reg. at 44,029 (noting "serious conservation impacts" from overages for greater amberjack, as well as "negative socio-economic effects in the long-term"). In these situations it is critical to avoid such overages (via use of buffers) and to recover them when they do occur (via use of paybacks).

### III.    50 C.F.R. § 622.41(a): Routine and Mandatory Paybacks for Greater Amberjack

The current regulatory language mandating payback for greater amberjack overages is located in two subparagraphs within 50 C.F.R. § 622.41(a). The recreational payback provision reads as follows:

> [I]f recreational landings, as estimated by [NMFS], exceed the recreational ACL [annual catch limit], as specified in paragraph (a)(2)(iii) of this section, [NMFS] will file a notification with the Office of the Federal Register, at or near the beginning of the following fishing year to reduce the recreational ACT [annual catch target] (recreational quota) and the recreational ACL [annual catch limit] for that following year by the amount of any recreational overage in the prior fishing year.

*Id.* § 622.41(a)(2)(ii). The commercial provision is virtually identical. *Id.* § 622.41(a)(1)(ii).

The way this regulation is operationalized is precisely what one would imagine: after the fishing season closes, NMFS estimates the amount of greater amberjack that were landed, and if landings exceeded the sector's annual catch limit, the agency publishes a temporary rule in the Federal Register adjusting that sector's annual catch limit and season length for the following year. *See, e.g.*, 88 Fed. Reg. 80,995 (Nov. 21, 2023) (commercial payback); 84 Fed. Reg. 22,073 (May 16, 2019) (commercial payback); 82 Fed. Reg. 14,477 (Mar. 21, 2017) (recreational payback); 81 Fed. Reg. 48,719 (July 26, 2016) (recreational payback); 79 Fed. Reg. 22,594 (Apr. 23, 2014) (recreational payback); 78 Fed. Reg. 13,284 (Feb. 27, 2013) (commercial payback); 77 Fed. Reg. 19,563 (Apr. 2, 2012) (commercial payback); 76 Fed. Reg. 23,909 (Apr. 29, 2011) (recreational and commercial payback); 75 Fed. Reg. 35,335 (June 22, 2010) (recreational and commercial payback).

Because paybacks are a routine matter, they are dealt with via temporary rules. Public comment is waived, since the action is merely implementing a substantive decision that was made elsewhere (specifically, in Amendment 30A and then recodified by Amendment 35). *See,*

*e.g.*, *id.* at 35,336 ("The final rule for Amendment 30A implementing these AMs [accountability measures] was subject to notice and comment, and all that remains is to notify the public of the 2010 commercial quota and season length for the 2010 recreational fishing season."); 88 Fed. Reg. at 80,995 (finding public comment "unnecessary because the regulations associated with the commercial AM [accountability measure] and the commercial ACL [annual catch limit] and ACT [annual catch target] reductions have already been subject to notice and public comment, and all that remains is to notify the public of the updated commercial ACL [annual catch limit] and ACT [annual catch target] for the 2024 fishing year.").

The last thing to understand about paybacks is that they must be issued early enough to enable full recovery of the overage amount.[1] If only a small amount of payback is necessary, there is more temporal flexibility, since the temporary rule merely needs to come out in time for the adjusted (slightly earlier) closure of the season. But if a large amount of payback is necessary, like zeroing out the entire annual catch limit for the coming year, there is less temporal flexibility; the temporary rule must come out before the new season has begun. If this does not occur, then fishing will commence and the opportunity to recover the full year's annual catch limit is lost. This timing aspect is what is being referenced, when the regulatory language states that the Federal Register notice applying payback must come out "at or near the beginning of the following fishing year." 50 C.F.R. § 622.41(a)(2)(ii).

---

[1] In practice the maximum amount that can be recovered is the full value of the next year's annual catch limit, as the agency generally does not set a negative annual catch limit for a given year. The next year's catch limit simply is set to zero, and anything beyond that year's full catch limit value is lost—meaning that the payback only carries forward one year.

**IV.    Defendants' Arbitrary Failure to Apply Payback for the 2024-2025 Overage**

The 2024-2025 recreational season for greater amberjack was open from September 1 to October 31, 2024. The recreational annual catch limit for this fishing year was 404,000 pounds, as established in Amendment 54. *See* 50 C.F.R. § 622.41(a)(2)(iii).

After the season closed, NMFS found that the recreational sector had landed more than twice its allotted amount during the 2024-2025 season—around 880,000 pounds. *See* NOAA Fisheries, 2024 and 2025 Gulf of America Recreational Landings and Annual Catch Limits (ACLs) and Annual Catch Targets (ACTs), https://www.fisheries.noaa.gov/southeast/ recreational-fishing/2024-and-2025-gulf-america-recreational-landings-and-annual-catch (updated Sept. 3, 2025) (reflecting a total amount of landed greater amberjack of 882,451 pounds) (attached to Atkinson Declaration as Exhibit 1); *see also id.* (updated Aug. 18, 2025) (earlier page showing 877,334 pounds) (attached to Atkinson Declaration as Exhibit 2).

The NMFS Southeast Regional Office appears to have prepared the paperwork for a recreational payback as usual, and sent it to NMFS headquarters for approval. *See* Letter from Jonathan Dugas, Council Chair, Gulf Council, to Eugenio Piñeiro Soler, Assistant Administrator, National Marine Fisheries Service, dated Sept. 3, 2025 (attached to Atkinson Declaration as Exhibit 3) ("NOAA Fisheries staff from the Southeast Regional Office indicated that a closure notice was prepared and sent to NOAA headquarters some time ago.").

Despite everything being set for issuance of a temporary rule applying payback under 50 C.F.R. § 622.41(a)(2)(ii), no such temporary rule was published in the Federal Register in August 2025.

As August wore on, stakeholders and the Council began to have questions about where the temporary rule was. Concern was warranted because the 2025-2026 recreational annual catch

12

limit would have to be fully zeroed out, given the large size of the prior year overage, and this meant the temporary rule would need to be published and effective before September 1, 2025. For example, the Gulf Council posted the following on Facebook:

> The Council wants to make anglers aware of the current uncertainty surrounding the 2025 recreational greater amberjack season. The season is scheduled to open September 1 through October 31, 2025. However, landings data from last year shows that recreational harvest exceeded the annual catch limit. Under existing accountability measures, the overage would automatically trigger a reduction in this year's annual catch limit and annual catch target, resulting in the season being closed. To date, no formal announcement on the 2025 fishing season has been made by the National Marine Fisheries Service and the Department of Commerce. We recognize that this situation, and the uncertainty it creates, is far from ideal for anglers, businesses, and coastal communities.

Gulf Council Facebook post dated Aug. 20, 2025 (attached to Atkinson Declaration as Exhibit 4). *See also* Gulf Council Facebook post dated Aug. 29, 2025 (attached to Atkinson Declaration as Exhibit 5) ("No news about the recreational greater amberjack season yet...").

> At its August meeting, the Council unanimously voted to approve the following motion:

> [D]raft and transmit a letter to the NOAA Fisheries Assistant Administrator expressing the Council's concern that the agency has not yet finalized the rulemaking for greater amberjack management measures in federal waters of the Gulf of America, despite requirements under the Magnuson-Stevens Act to implement accountability measures when catch limits are exceeded. The letter should inquire about: (1) the reason for the delay in finalizing the rule, (2) the expected timeline for publication and implementation, and (3) how NOAA Fisheries intends to ensure compliance with the accountability measure requirements that mandate adjustments to prevent overfishing, account for overages and ensure continued progress on rebuilding.

Gulf Council Motions Report at 8, *available at* https://gulf-council-media.s3.amazonaws.com/uploads/2025/09/GC_Motions-Report_Aug2025-FINAL.pdf (attached to Atkinson Declaration as Exhibit 6).

No temporary rule applying payback was published by September 1, 2025. Instead, the recreational greater amberjack season opened under the default season opening provisions at 50 C.F.R. § 622.34(c). *See* Gulf Council Facebook post dated Sept. 1, 2025 (attached to Atkinson Declaration as Exhibit 7) ("UPDATE: We haven't gotten a closure notice from NOAA for recreational greater amberjack season. That means the season defaults to OPEN for now. We will let you know if we hear anything different.").

On September 3, 2025, the Council transmitted its letter to NMFS regarding the greater amberjack situation. In the letter, the Council reprinted the relevant regulations at 50 C.F.R. § 622.41(a), observed that the estimated recreational greater amberjack landings in 2024-2025 were 877,334 pounds (per the earlier version of the website cited above), and pointed out that this meant the recreational sector had caught 217 percent of its available limit for that year. *See* Letter from Jonathan Dugas, *supra* page 12 (Exhibit 3).

As the Council noted in its letter, "this overage automatically triggers a reduction in the 2025 recreational ACL [annual catch limit]," and because the overage was so large, it "results in a complete recreational fishing closure in 2025." *Id.* at 1. The Council further stated:

> The Council is concerned about annually exceeding the ACL for greater amberjack as it is currently in an overfished status with a long-term rebuilding plan. Therefore, the Council is troubled about NOAA Fisheries' lack of compliance with the recreational greater amberjack accountably measures defined in the codified federal regulations and respectfully requests an explanation. Additionally, the Council requests an explanation for the delayed rulemaking, a timeline for implementation, and a plan for ensuring compliance in the future. Accountability measures are designed in part to correct quantifiable imbalances in realized catch against defined catch limits, with the purpose of ensuring the continued sustainability of a fish stock or complex. If accountability measures are not implemented as prescribed in the codified federal regulations, then it is possible that the continued sustainability of a fish stock or complex would be jeopardized. Further, a lack of enforcement of these accountability measures erodes public confidence in the federal fisheries management system.

*Id.* at 2.

As of the date of this filing, NMFS has not responded to the Council, nor has there been any temporary rule published in the Federal Register applying the recreational accountability measure at 50 C.F.R. § 622.41(a)(2)(ii), based on the 2024-2025 overage. Instead, the recreational greater amberjack season is open and fish are being removed from the population every day.

## STANDARD OF REVIEW

"The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction." *Elec. Privacy Info. Ctr. v. Fed. Trade Comm'n*, 844 F. Supp. 2d 98,101 (D.D.C. 2012) (Jackson, J.) (internal quotation omitted). Specifically, a plaintiff " 'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Gober v. Collins*, No. 1:25-cv-714-RC, at 7 (D.D.C. May 8, 2025) (Contreras, J.) (alterations in original, quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). In practice "[t]he last two factors merge when the Government is the opposing party." *Id.* (internal quotations omitted).

"[A] plaintiff seeking preliminary injunctive relief 'must make a clear showing that four factors, taken together, warrant relief.'" *Agua Caliente Band of Cahuilla Indians v. Mnuchin*, No. 1:20-cv-1136, at 6 (D.D.C. May 11, 2020) (Mehta, J.) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (further quotation omitted)). There is some uncertainty about whether a sliding scale is to be used within the D.C. Circuit when applying the injunction test—i.e., whether a stronger showing under one factor can make up for a weaker showing under another. *See id.* Regardless, the bar is high; temporary restraining orders and preliminary

injunctions represent an exercise of a court's equitable powers, and often are characterized as "extraordinary remed[ies]." *Winter*, 555 U.S. at 22.

"The movant's burden is still higher where, as here, the movant's requested injunction is mandatory—that is, its terms would alter, rather than preserve, the status quo by commanding some positive act.'" *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 397 (D.D.C. 2020) (Mehta, J.) (cleaned up).

## ARGUMENT

Preliminary relief is necessary because harm is ongoing—right now—as a result of Defendants "unlawfully withh[olding]" action. 5 U.S.C. § 706(1). Defendants illegally allowed the recreational season for greater amberjack to open on September 1, and unless the Court compels Defendants to act, fishing will continue through October 31.[2]

Were Plaintiffs to proceed under an ordinary motion for summary judgment, the season would be long since closed by the time the Court issued an opinion. At that point, Defendants would have succeeded in allowing an entire season's worth of illegal catch, and the Court would be too late to affect it. Absent preliminary relief, nothing on the water during the 2025-2026 season actually will change, and Defendants presumably could do the same thing next year.

Defendants are well aware of this "catch me if you can" dynamic when it comes to fishery management. Fisheries move quickly, the Magnuson-Stevens Act has a short statute of limitations, and Defendants argue mootness at the drop of a hat. In a similar situation from 2017, Defendants successfully avoided any accountability for illegally re-opening the Gulf red snapper season and allowing overfishing on that stock. *See Ocean Conservancy v. Ross*, No. 1:17-cv-

---

[2] The default season opening and closing dates are September 1 and October 31, respectively. *See* 50 C.F.R. § 622.349(c).

1408-ABJ (D.D.C. Order filed Sept. 6, 2017) (Jackson, J.) ("Plaintiffs ask the Court to . . . vacate and set aside the 2017 rule. But the 2017 red snapper season has already run its course."); *id.* (Order filed Dec. 20, 2017) (dismissing the case with no remedy, while noting that "federal defendants have not elected to defend [their action] on the merits").

For these reasons, Plaintiffs request preliminary relief. Defendants have a discrete and mandatory duty to apply the regulations at 50 C.F.R. § 622(a)(2)(ii), and their inaction is damaging the greater amberjack stock and the integrity of the management system, as well as effectuating a reallocation adverse to Plaintiffs. Irreparable harm is occurring, and the public interest would be served by an injunction compelling Defendants to follow the law and apply the regulations.

## I.    Plaintiffs Are Likely to Succeed on the Merits

"A plaintiff's likelihood of success is the 'most important factor' in determining whether preliminary injunctive relief is warranted." *Am. First Legal Found. v. Becerra*, No. 1:24-cv-1092-RC, at 8 (D.D.C. Aug. 9, 2024) (Contreras, J.) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)). Here, the merits are straightforward. Plaintiffs' sole claim proceeds under the ordinary APA inaction standard, and turns on simple facts that are mostly established in the Federal Register.

### A.    APA Review Is Available in Situations Not Covered by 16 U.S.C. § 1855(f)

The Magnuson-Stevens Act expressly provides for judicial review of fishery management regulations and actions, at 16 U.S.C. § 1855(f). That section states:

> (f) JUDICIAL REVIEW.—
> (1) Regulations promulgated by the Secretary under this Act and actions
> described in paragraph (2) shall be subject to judicial review to the extent
> authorized by, and in accordance with, [the APA], if a petition for such review is

filed within 30 days after the date on which the regulations are promulgated or the
action is published in the Federal Register, as applicable; except that—

> (A) section 705 of such title is not applicable, and
>
> (B) the appropriate court shall only set aside any such regulation or action
> on a ground specified in section 706(2)(A), (B), (C), or (D) of such title.

(2) The actions referred to in paragraph (1) are actions that are taken by the
Secretary under regulations which implement a fishery management plan,
including but not limited to actions that establish the date of closure of a fishery to
commercial or recreational fishing.

> (3)    (A) Notwithstanding any other provision of law, the Secretary shall file a
> response to any petition filed in accordance with paragraph (1), not later
> than 45 days after the date the Secretary is served with that petition, except
> that the appropriate court may extend the period for filing such a response
> upon a showing by the Secretary of good cause for that extension.
>
> (B) A response of the Secretary under this paragraph shall include a copy
> of the administrative record for the regulations that are the subject of the
> petition.

(4) Upon a motion by the person who files a petition under this subsection, the
appropriate court shall assign the matter for hearing at the earliest possible date
and shall expedite the matter in every possible way.

*Id.* § 1855(f).

As the courts have recognized, this section establishes a customized framework for
judicial review of fishery management actions: plaintiffs must file suit within an extremely short
30-day statute of limitations and they may not request preliminary relief under Section 705 of the
APA, but in exchange such cases receive expedited review under paragraphs (3) and (4) of 16
U.S.C. § 1855(f). *See, e.g.*, *Blue Water Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 158
F. Supp. 2d 118, 124 (D. Mass. 2001) (noting "the Magnuson-Stevens Act trades preliminary
relief for expedited review").

Importantly, however, the Act leaves intact the ordinary framework for judicial review of
agency *inaction*. Section 1855(f) is limited to judicial review of agency *action*—specifically
described as "[r]egulations promulgated by the Secretary under this Act and actions described in

paragraph (2)." 16 U.S.C. § 1855(f)(1).[3] Agency inaction falls outside the scope of Section 1855(f), and for good reason: it would make no sense to apply a 30-day statute of limitation to a case seeking to compel action "unreasonably delayed" under Section 706(1) of the APA, as such cases generally lack a specific starting point for the statute of limitations.

The tightly orchestrated structure for judicial review provided in 16 U.S.C. § 1855(f) is a counterpart to a regulatory system in which everybody is watching agency action as it takes shape—i.e., where stakeholders, NMFS, and state representatives all participate elbow to elbow at the councils. In this system, arguments have been had and decisions made, by the time a draft agency action is sent over to NMFS for review and approval, and it is fair to expect that any interested parties will be ready to file suit within 30 days of the action publishing in the Federal Register.

Agency inaction, by contrast, can arise in myriad situations ranging from little notice (as in the case at hand) to very long and passive wind-ups (as in action unreasonably delayed cases). It also can and often does arise outside the council process; the APA 706(1) violation occurs because of something NMFS fails to do on its own.

So the express text of the Act, as well its as structure and context, reflect that agency inaction claims under APA Section 706(1) remain outside the scope of 16 U.S.C. § 1855(f), and are governed by default APA and civil procedure rules. *See also Kapa'a v. Trump*, No. 1:25-cv-209-MWJS-WRP, at 24 (D. Haw. Aug. 8, 2025) ("The fact that § 1855(f) is inapplicable here, however, does not mean that no judicial review is available for Plaintiffs' Magnuson Act claim. Even when § 1855(f) does not apply, judicial review of a Magnuson Act claim may be available

---

[3] The actions described in paragraph (2) are implementing actions taken under fishery management plan regulations. 16 U.S.C. § 1855(f)(2). *See generally Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104 (9th Cir. 2006).

under the APA, which authorizes judicial review of final agency action for which there is no

other adequate remedy in a court." (cleaned up)); *id.* at 24 n.5 ("There are many classes of claims

'left untouched by § 1855(f)' [and] this is one of them." (quoting *Turtle Island Restoration

Network v. U.S. Dep't of Commerce*, 438 F.3d 937, 949 (9th Cir. 2006))).

### B.    Defendants' Duty to Apply the Greater Amberjack Accountability Measure at 50 C.F.R. § 622.41(a)(2)(ii) Is Discrete

To prevail on an agency inaction claim, a plaintiff must show that the agency's duty was

"discrete"—meaning it was a duty to take an action of the type listed at 5 U.S.C. § 551(13), or

similar thereto. *Norton*, 542 U.S. at 62–63. That list includes "the whole or a part of an agency

rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13).

Here, NMFS's duty was to publish in the Federal Register a "a notification" serving to

reduce the relevant catch limits for the upcoming fishing year. 50 C.F.R. § 622.41(a)(2)(ii). *Id.*

The notification functions as "an agency statement of . . . particular applicability and future

effect designed to implement . . . law or policy." 5 U.S.C. 551(4) (APA definition of "rule").

Given this function, NMFS sensibly has styled its "notifications" under 50 C.F.R.

§ 622.41(a)(1)(ii) and (2)(ii) as temporary rules. *See supra* page 10 (listing past temporary rules

published in Federal Register under the payback provisions).

NMFS's duty to publish a temporary rule reducing the 2025-2026 Gulf recreational

greater amberjack annual catch limit fits squarely within the list of agency functions at 5 U.S.C.

§ 551(13) and therefore is "discrete" within the meaning of *Norton v. SUWA. See, e.g.*, *Am. Anti-

Vivisection Soc'y v. U.S. Dep't Agric.*, 946 F.3d 615 (D.C. Cir. 2020) (finding duty to issue

specific standards to be "discrete"). It is not a generalized deficiency in compliance, nor a broad

programmatic responsibility that has yet to take form through the regulatory process. *See Norton*,

542 U.S. at 65-67 (rejecting such a claim under APA Section 706(1)).

20

### C.    Defendants' Duty to Apply the Greater Amberjack Accountability Measure at 50 C.F.R. § 622.41(a)(2)(ii) Is Non-Discretionary

"Legally required" actions are those in which the agency's duty is specific and unequivocal; they are also known as non-discretionary duties. *Id.* at 63-65. NMFS's duty to apply the accountability measure at 50 C.F.R. § 622.41(a)(2)(ii) meets this definition.

First, the Secretary's duty to apply regulations implementing fishery management plans is clearly set forth in statute. Section 1855(d) of the Act is entitled "RESPONSIBILITY OF THE SECRETARY," and states, "The Secretary shall have general responsibility to carry out any fishery management plan or amendment approved or prepared by him, in accordance with the provisions of this Act." 16 U.S.C. § 1855(d). This provision was included in the original Act in 1976. *See* Pub. L. No. 94-265, § 305(g), 90 Stat. 331, 355 (1976); S. Rep. No. 94-711, at 54 (1976) (Conf. Rpt.) (noting Section 305 contained "general provisions on the responsibility of the Secretary of Commerce to carry out [fishery management] plans"). The only area in which responsibility under the Magnuson-Stevens Act extends beyond the Secretary of Commerce is enforcement—where the Secretary of the department in which the Coast Guard is operating is assigned responsibility alongside the Secretary of Commerce. *See* 16 U.S.C. § 1861(a).

The regulations at issue in this case were duly promulgated as implementing regulations for Amendment 35 to the Reef Fish fishery management plan in the Gulf. *See* 77 Fed. Reg. 67,574 (Amendment 35 final rule). They do not involve enforcement, and as such the Secretary of Commerce[4] retains sole responsibility to "carry out" their contents. 16 U.S.C. § 1855(d).

Second, Defendants' responsibility under Section 1855(d) of the Act does not contain any discretion. The duty is to "carry out" fishery management plans, and that is what Defendants

---

[4] The Secretary of Commerce, in turn, has assigned his responsibility for fishery management plan implementation to NMFS through as series of internal delegations.

must do; there is no space for policy preferences or discretionary judgments at the implementation stage. To the extent Defendants wish to express their own views about fishery management, the Act provides two places for them to do so. One is at the councils, where NMFS is given a permanent seat and can shape policy from the ground up. *See* 16 U.S.C. § 1852(b)(1)(B). The other is at the stage of reviewing fishery management plans and regulations, where NMFS is free to reject council recommendations, *id.* § 1854(a)-(b), or even develop its own actions based on any "need for conservation and management," *id.* § 1854(c), which is an extremely broad mandate. By the time the implementation stage is reached, substantive decisions have already been made and Defendants' job is just to "carry out" the plan. *Id.* § 1855(d).

Third, and moving down to the regulatory level, the specific accountability measure regulation at 50 C.F.R. § 622.41(a)(2)(ii) is non-discretionary. The regulatory text uses a clear if/then structure, stating that NMFS "will file" the required notification if certain conditions are met. Nowhere in the text is there space for other considerations to enter and affect the outcome; nor is there any indication that the designated outcome (NMFS filing the notification) might vary or simply not apply. *See, e.g.*, *In re: United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 550 (D.C. Cir. 1999) ("Nothing about the language of those deadlines suggests they are anything other than mandatory.").

Defendants' prior practice and statements both support this reading of 50 C.F.R. § 622.41(a)(2)(ii) (and (a)(1)(ii)) as non-discretionary. Paybacks have been applied routinely over the years since they were established in 2008, with nobody (including NMFS, the states, or other stakeholders) ever asserting that paybacks were a discretionary matter. *See supra* page 10 (listing Federal Register notices where Gulf greater amberjack paybacks have been

implemented). To the contrary, NMFS regularly has said the opposite—that paybacks are mandatory under the regulations. *See, e.g.*, 88 Fed. Reg. at 80,995 ("*This action is required* by 50 CFR 622.41(a)(1)(ii), which was issued pursuant to section 304(b) of the Magnuson-Stevens Act . . . ." (emphasis added)); 84 Fed. Reg. at 22,073 ("Under 50 CFR 622.41(a)(1)(ii), *NMFS is required* to reduce the commercial ACL [annual catch limit] and the commercial ACT [annual catch target] for greater amberjack in the year following an overage of the commercial ACL [annual catch limit], by the amount of the overage." (emphasis added)); 82 Fed. Reg. at 14,477 (same but for recreational sector and referencing 50 C.F.R. 622.41(a)(2)(ii) rather than (a)(1)(ii)); 75 Fed. Reg. at 35,336 ("Given the *legal obligation* for NMFS to announce the duration of recreational season in a timely manner, it is important this announcement be made as soon as possible . . . ." (emphasis added)).

### D.    Action Has Been Unlawfully Withheld or Unreasonably Delayed Under the *TRAC* Framework

With a discrete and mandatory duty, the remaining step is to evaluate whether action has been "unlawfully withheld or unreasonably delayed" under the *TRAC* framework. *See, e.g.*, *Am. Anti-Vivisection Soc'y*, 946 F.3d at 621. Relevant factors are as follows:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Telecommunications Research & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 80 (D.C. Cir. 1984) (cleaned up). As another court in this District recently noted:

> These six factors are often grouped into four questions: First, is there any rhyme or reason—congressionally prescribed or otherwise—for an agency's delay (factors one and two)? Second, what are the consequences of delay if the Court does not compel the agency to act (factors three and five)? Third, how might forcing the agency to act thwart its ability to address other priorities (factor four)? Finally, is the delay intentional or due to any impropriety on the part of the agency (factor six)?

*Babaei v. U.S. Dep't of State*, 725 F.Supp.3d 20, 30 (D.D.C. 2024) (Kelly, J.) (cleaned up).

Here, the *TRAC* factors decisively favor compelling action.

On factors one and two, Defendants offer no explanation—much less a rule of reason—supporting their failure to apply the accountability measure in question. To the contrary, Defendants violated an express deadline: payback is to be applied "at or near the beginning of the [2025-2026] fishing year." 50 C.F.R. § 622.41(a)(2)(ii). And not only is this deadline express in the regulations, but it exists for a functional reason: the timing of NMFS's action affects how much overage can be recovered in the following season. Here, action was needed *before* the start of the season (i.e., before September 1), because a full payback was necessary and the season was to be zeroed out. Delay precludes a full payback in 2025-2026, as fishing has already started. *See generally supra* page 11 (discussing timing aspect).

In this situation, the regulatory deadline " 'suppl[ies] content for th[e] rule of reason' by which the agency's delay must be evaluated." *Agua Caliente Band of Cahuilla Indians*, No. 1:20-cv-1136, at 10 (quoting *TRAC*, 750 F.2d at 80). *See also In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 837 (D.C. Cir. 2012) (per curiam) (evaluating length of delay in relation to the function of agency action within the relevant statutory framework); *In re Pub. Emps. for Envtl. Responsibility*, 957 F.3d 267 (D.C. Cir. 2020) ("[A] reasonable time for action depends on

'the complexity of the task at hand, *the significance . . . of the outcome*, and the resources available to the agency.'" (emphasis added) (quoting *Mashpee Wampanoag Tribal Council, Inc. v. Norton* , 336 F.3d 1094, 1102 (D.C. Cir. 2003))). Defendants already have undermined the accountability framework by failing to apply payback before the start of the season; further delay is not reasonable within the meaning of *TRAC* factors one and two.

On factors three and five, the consequences of further delay at this point are significant. With every passing day, the ability to recover last year's overage diminishes. If the Court does not compel action here, a full new recreational fishing season for greater amberjack will take place during the 2025-2026 year, and last year's substantial overage would go un-recovered. This would harm the greater amberjack population, likely leading to delayed rebuilding and more years spent under the current restrictive regulations. Also if the Court does not compel action, Defendants' accountability measures for greater amberjack would be called into question and the integrity of the management system would be damaged. All this harm, in turn, would come to rest on Plaintiffs' doorsteps, as they depend on both the fish stock and the management system. *See infra* Argument Section II. With substantial impacts—which do affect human welfare— *TRAC* factors three and five favor compelling action. *See id.*; *cf. In re Pub. Emps. for Envtl. Responsibility*, 957 F.3d at 274 (giving weight to human impacts that are substantially milder than those at stake here).

Regarding factor four, there is zero concern here about redirecting agency resources away from other priorities. The paperwork for the closure has been completed, *see* Letter from Jonathan Dugas, *supra* page 12 (Exhibit 3), and is resting on the desk of a political appointee somewhere above NMFS. All staff hours necessary for the action have been expended already by NMFS; all that remains is approval and publication in the Federal Register. This is not a situation

of competing projects or a backlog of applications, where Plaintiffs are seeking to "jump the queue" and advance their item at the expense of other previously-scheduled workload. *See In re Barr Labs., Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991). Plaintiffs instead are trying to shake loose an already-completed management action that appears to have been waylaid by political interference. This favors compelling action under the *TRAC* analysis. *See In re Pub. Emps. for Envtl. Responsibility*, 957 F.3d at 275 ("[W]e need not reorder the agencies' priorities to grant relief here.").

And on factor six, while some details are not clear (such as exactly who ordered the stop on the rule), it is widely understood that the delay here is intentional. Allowing extra recreational fishing here is the point. *Cf. supra* pages 16-17 (discussing illegal 2017 red snapper season). It is not necessary to show the sixth *TRAC* factor, but when the delay is intentional, as it is here, it counsels in favor of compelling action. *In re Barr Labs.*, 930 F.2d at 76 ("Where the agency has manifested bad faith, . . . the agency will have a hard time claiming legitimacy for its priorities."); *see also Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987) (similar).

All *TRAC* factors tilt toward compelling action. When combined with the discrete and mandatory nature of Defendant's duty under 50 C.F.R. § 622.41(a)(2)(ii), this means it is highly likely that Plaintiffs prevail on the merits.

## II.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

The standard for irreparable harm[5] is high but not insurmountable.  There are a few different aspects to the inquiry:

---

[5] Plaintiffs' position is that the facts set forth in this section also serve to establish standing. While standing and irreparable harm are distinct legal concepts, in this case the facts are simple and direct enough that the necessary showing overlaps between the two, with standing representing the lower bar.

> First, "the injury must be both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The party seeking relief must show that the complained-of injury is so imminent that there is a clear and present need for equitable relief. *Id.* Second, the movant must "substantiate the claim that irreparable injury is 'likely' to occur." *Id.* (citation omitted). That means a party cannot rely on bare allegations of harm, but instead must come forward with "proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.* Third, the moving party must establish causation. That is, it "must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Id.*

*Dallas Safari Club*, 453 F. Supp. 3d at 398-99; *see also Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

There are a few different ways to understand the harm being caused by Defendants' inaction here. All are significant, likely to occur or ongoing already, not capable of remedy once they occur, and directly caused by Defendants' failure to apply the payback regulations.

### A.    Defendants' Inaction Is Reallocating Greater Amberjack Away From the Commercial Sector

The governing allocation ratio for amberjack was established in Amendment 54, at 80% recreational and 20% commercial. *See* 88 Fed. Reg. at 39,195. This 4-to-1 ratio is reflected in the sectors' annual catch limits, as the recreational sector is given 404,000 pounds each year while the commercial sector receives 101,000 pounds. *Id.* at 39,201.

In the 2024-2025 fishing year, NMFS's best estimate indicates that the recreational sector caught over 880,000 pounds of amberjack. *See* 2024 and 2025 Gulf of America Recreational Landings, *supra* page 12 (Exhibit 1). The commercial sector caught 101,505 pounds.[6] *See*

---

[6] The recreational and commercial fishing years for greater amberjack are offset, with the recreational year beginning August 1, and the commercial year beginning January 1. For this reason it is not always clear which fishing years to match up with each other when making a

NOAA Fisheries, 2024-2025, 2025, and 2025-2026 Preliminary Gulf of America Landings,

https://www.fisheries.noaa.gov/southeast/commercial-fishing/2024-2025-2025-and-2025-2026-preliminary-gulf-america-commercial.

Failing to apply the payback provision serves to sanction the recreational overage for 2024-2025, meaning NMFS has applied an actual allocation ratio of over 8-to-1 for that year. This effectively doubles the recreational sector's share, at the expense of the commercial sector.

NMFS's own regulations define an allocation as "a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals," and clarify that "only those measures that result in direct distributions of fishing privileges will be judged against the allocation requirements" of the Act. 50 C.F.R. § 600.325(c)(1). As an example, NMFS notes that allocations include "different quotas or fishing seasons for recreational and commercial fishermen." *Id.*

Here, Defendants' inaction absolutely represents a "deliberate distribution of the opportunity to participate in a fishery." *Id.* The accountability measure paperwork was done and sent up to Commerce early; Defendants' inaction is an intentional deviation from the existing rules that results in the recreational sector having a substantial increase in "opportunity to participate in a fishery." *Id.* As such, Defendants' inaction fits squarely within their own definition of "allocation."

---

comparison; the text above compares the 2025 commercial fishing year with the 2024-2025 recreational year. The same conclusion would hold, however, if the 2024 commercial fishing year were used, as the commercial sector in 2024 stayed under its annual catch limit (which was adjusted downward as payback for a prior year overage). *See* NOAA Fisheries, 2023-2024 and 2024 Preliminary Gulf of America Commercial Landings, https://www.fisheries.noaa.gov/southeast/commercial-fishing/2023-2024-and-2024-preliminary-gulf-america-commercial-landings (estimate of 52,262 pounds of amberjack caught in 2024 commercial fishing year, under an adjusted catch limit of 65,720 pounds).

Plaintiffs and other commercial fishermen are harmed directly by being on the losing end of this reallocation, as their share of the fishery has been diminished without any of the legally-required safeguards. *See, e.g.*, 16 U.S.C. § 1851(a)(4) (National Standard 4 providing substantive standards for allocations); 50 C.F.R. § 600.325(c)(2) (analytical requirements for allocation decisions). Plaintiffs had no notice or comment or ability to weigh in regarding this temporary reallocation, and the agency provided no supporting analysis whatsoever. Instead, Defendants just arbitrarily breached the management agreement embodied in Amendment 54. Moreover, Plaintiffs disagree vehemently with the substantive premise of the reallocation—that recreational fishing should receive a double share of the harvest.

The reallocation here represents a significant harm to Plaintiffs, and it is an actual and imminent consequence of Defendants' actions. From the very nature of the situation, it is "certain to occur," *Wis. Gas Co.*, 758 F.2d at 674, and it is irremediable once it is done, because the fishing year will have has passed. Further, it "directly result[s] from the action which the movant seeks to enjoin." *Id.* For these reasons, the adverse reallocation caused by Defendants' failure to apply the payback provision satisfies the requirement for irreparable harm.

## B. Defendants' Inaction Damages the Gulf Fishery Management System, Upon Which Commercial Fishermen Depend

Plaintiffs are commercial fishermen, fish buyers, and processors. They rely on a strong fishery management system for their livelihoods and identities. Without an effective management system, political pressure increases, fisheries quickly become overfished, markets get less manageable, and sector and gear conflict increases. Fundamentally, Plaintiffs need Gulf fisheries management to succeed.

A few weeks ago, Defendants applied the commercial accountability measure for greater amberjack at 50 C.F.R. § 622.41(a)(1)(i), closing the commercial season as catch numbers

indicated the sector catch limit was being reached. 90 Fed. Reg. 42,138 (Aug. 29, 2025). This was the correct procedure, as specified in regulations.

Just a few days later, however, Defendants withheld and failed to apply the recreational accountability measure for greater amberjack—located in the very same subsection of the Code of Federal Regulations. As discussed above, this was not due to staffing or capacity restrictions, or other agency priorities. Instead, all indications suggest it was a deliberate decision intended to give an extra season to the recreational sector. *See supra* pages 12-15.

Defendants' failure to apply regulations evenhandedly between the commercial and recreational sectors is extremely damaging to the fishery management process. Fishery management depends critically on trust and legitimacy. *See, e.g.*, Tom R. Tyler, Psychological Perspectives on Legitimacy and Legitimation, 57 Ann. Rev. Psychol. 375 (2006) (attached to Atkinson Declaration as Exhibit 8) (discussing voluntary compliance based on legitimacy); Jon G. Sutinen & K. Kuperan, A Socio-Economic Theory of Regulatory Compliance, 26 Int'l J. Social Econ. 174, 177 (1999) (attached to Atkinson Declaration as Exhibit 9) (noting penalty-based compliance is "generally not feasible" in fisheries management); *see also* Declaration of David Krebs ("Krebs Decl.") ¶¶34-37.

As stakeholders watch the rules being broken to favor one sector, it leads them to lose confidence in and disengage from the management process. Trust in the system goes down. *See, e.g.*, Letter from Jonathan Dugas, *supra* page 12 (Exhibit 3) (expressing Gulf Council's concern about Defendants' actions, and noting that "a lack of enforcement of these accountability measures erodes public confidence in the federal fisheries management system"); Krebs Decl. ¶36; *cf.* Sutinen & Kuperan, *supra*, at 187-88 (Exhibit 9) (similarly noting in enforcement context: "This sends two signals to normally law-abiding participants. One is that regulatory

procedures are unfair, having no effect on flagrant violators. The other is that the regulatory program is not effectively achieving its purpose (e.g. protecting the fishery resource).").

The Gulf management system already was at a tenuous point, with several decades of catch restrictions and a steady explosion in recreational fishing power along the Gulf coast. Recreational fishermen have watched many of their seasons shorten as fishing effort increases, and a culture of resentment and mistrust of management has built up within that sector. Commercial fishermen, in turn, have watched the influence of the recreational sector surge in the past two decades, with their own interests frequently being sidelined in the process. *See* Krebs Decl. ¶¶31-32, 41; Declaration of Steven Rash ("Rash Decl.") ¶¶27-28; Declaration of David Maginnis ("Maginnis Decl.") ¶30.

Defendants' action here deeply exacerbates the problem. On the recreational side, even though anglers are nominally the "winners" from the illegal season, Defendants' action still undermines buy-in to the management system. Recreational fishermen see the law not being applied, and while they benefit in the near term, it leaves behind a sense that the just do not matter. This impact is real, and it is already underway. *See, e.g.*, Facebook: comments responding to Gulf Council post of August 20, 2025 (attached to Atkinson Declaration as Exhibit 10); Facebook: comments responding to Gulf Council post of August 29, 2025 (attached to Atkinson Declaration as Exhibit 11); Facebook: comments responding to Gulf Council post of September 1, 2025 (attached to Atkinson Declaration as Exhibit 12); *see also* Krebs Decl. ¶36.

And on the commercial side, Defendants' actions essentially confirm what they have feared for a while now. Commercial fishermen believe the management system has become more biased toward the recreational sector, based on ever-increasing allocations, lack of accountability for dead discards, and so forth. NMFS now is explicitly flouting the law to enable recreational

fishing, and in many commercial fishermen's eyes, this is explicit and direct proof that the agency is "captured" by the recreational sector. This deeply undermines commercial fishermen's trust in the system. Declaration of David Walker ("Walker Decl.") ¶¶25, 28; Krebs Decl. ¶¶31-32; Rash Decl. ¶¶27-30, 37; Maginnis Decl. ¶31.

Damage to the management system is a real problem for Plaintiffs, as their lives and livelihoods depend on strong and successful governance of Gulf fisheries. Krebs Decl. ¶¶29, 39; Rash Decl. ¶¶26, 32; Maginnis Decl. ¶¶29, 33; Walker Decl. ¶30.  And if Defendants' actions go unaddressed, the harm will be not be repairable. A breach of trust like this will not be remedied by a clarifying statement from NMFS or a press release from the Council; it erodes the integrity of the system and the credibility of managers in an irreparable way. Rash Decl. ¶31; Maginnis Decl. ¶¶31-32, 34; Walker Decl. ¶¶24-25, 28-29, 31; Krebs Decl. ¶¶40, 42; *cf., e.g.*, Rachel A. Turner et al., Trust, Confidence, and Equity Affect the Legitimacy of Natural Resource Governance, 21 Ecol. & Soc'y 18 (2016) (attached to Atkinson Declaration as Exhibit 13) (noting their "findings demonstrate the particular importance of trust as a prerequisite for legitimacy in a large, complex, social-ecological system").

Finally, NMFS's damage to the fishery management system has the effect of pushing commercial fishermen, buyers, and processors toward the exit. Nobody wants to be working in a field where they simply do not trust those making rules over them. And from a business standpoint, regulatory stability and predictability is critical—so this kind of arbitrary breaking of the rules makes it almost impossible for Plaintiffs and others to work within the space. Krebs Decl. ¶¶38-39, 42-43; Maginnis Decl. ¶¶33-34; Rash Decl. ¶33. Defendants' actions also create a deterrent for any prospective new entrants to the fishery, for the same reasons—lack of regulatory stability and mistrust of managers—which in turn harms Plaintiffs' ability to pass the

fishery on to a new generation and see their culture and livelihoods carry on. Rash Decl. ¶34;
Krebs Decl. ¶¶42-43; Maginnis Decl. ¶34.

### C. Defendants' Inaction Harms the Greater Amberjack Stock, With Which Plaintiffs' Lives Are Intertwined

Like the Gulf management system, the greater amberjack stock is in a delicate position
right now. After decades of overfishing, managers in Amendment 54 reduced allowable catch
levels dramatically, starting in the 2022-2023 fishing year. The idea was that the new low catch
limits would end overfishing and allow amberjack to rebuild by its deadline of 2027. *See
generally* 88 Fed. Reg. 39,193.

But for rebuilding actually to happen, both sectors must stay under their new limits. *See*
Gulf of Mexico Fishery Management Council, Final Amendment 54 to the Fishery Management
Plan for the Reef Fish Resources of the Gulf of Mexico: Modifications to the Greater Amberjack
Rebuilding Plan, Catch Limits, and Sector Allocations, at ix (Jan. 2023) ("Amendment 54"),
*available at* https://gulf-council-media.s3.amazonaws.com/uploads/2025/03/Final-Amendment-
54-01202023.pdf (attached to Atkinson Declaration as Exhibit 14) ("Each sector is limited to
their respective ACLs [annual catch limits] and existing accountability measures would remain
in place. As long as harvest does not exceed the sector-specific ACL [annual catch limit], no
negative biological effects are expected. Positive biological effects are expected from reduced
annual harvests, allowing the stock to rebuild by 2027.").

Since Amendment 54 was implemented, the commercial sector has stayed within its limits.[7] But the recreational season has not[8]—and last year, recreational catch was more than double the recreational annual catch limit. The only way to deal with this and remain consistent with the rebuilding plan is to apply the (mandatory) payback provision, and recover the overage. By declining to do so, Defendants are undermining the premise upon which the greater amberjack rebuilding plan is based.

This is clear not only conceptually, but on a granular level too. With last year's recreational overage, greater amberjack catch has exceeded the amount allowed for in NMFS's rebuilding projections—both for last year alone (2024), and for the first three years of the projections cumulatively (2022-2024). *See* Gulf of Mexico SSC Review of the SEDAR 70 Greater Amberjack Assessment, at PDF page 12 (Jan./Sept./Nov. 2021), *available at* https://sedarweb.org/documents/report-of-the-gulf-of-mexico-ssc-review-of-the-sedar-70-greater-amberjack-assessment (attached to Atkinson Declaration as Exhibit 15). (ABC column in purple, showing maximum catch levels of 505,000, 631,000, and 750,000 pounds for years 2022, 2023, and 2024, respectively, in order to have a bare minimum 50% likelihood of rebuilding by 2027). Thus according to Defendants' own projections—which represent the best scientific information available—the greater amberjack stock now is more likely than not to *fail* to rebuild

---

[7] This statement is based on provisional numbers for the 2025 season, which just concluded on September 2 of this year. *See* 90 Fed. Reg. 42,138 (Aug. 29, 2025); 2024-2025, 2025, and 2025-2026 Preliminary Gulf of America Landings, *supra* page 28. It also relies on a payback that was implemented in the 2024 commercial fishing year, which recovered a commercial overage from 2023.

[8] In addition to last year's overage, the recreational sector incurred an unrepaid overage the previous year. *See* NOAA Fisheries, Gulf of Mexico Historical Recreational Landings and Annual Catch Limit (ACL) Monitoring, https://www.fisheries.noaa.gov/southeast/recreational-fishing-data/gulf-mexico-historical-recreational-landings-and-annual-catch. Plaintiffs did not challenge this previous failure of NMFS to apply the payback provision, however, as it was due to hurricane impacts to NMFS offices and staff from Helene and Milton.

by 2027. *Cf. Natural Res. Def. Council v. Daley*, 209 F.3d 747, 756 (D.C. Cir. 2000) (noting "the

at-least-50% likelihood [of success] required by statute" under Magnuson-Stevens Act).

Failing to rebuild by the deadline means another rebuilding plan, which prolongs the

current period of low catch limits or even lowers them further. It also prolongs what is a risky

period of time for the amberjack stock, as a depleted condition can reduce fish population

resilience to stochastic events as well as to climate and other oceanographic stressors. *See*

Benjamin Planque et al., How Does Fishing Alter Marine Populations and Ecosystems

Sensitivity to Climate?, 79 J. Mar. Systems 403 (2010) (attached to Atkinson Declaration as

Exhibit 16); R. Ian Perry et al., Sensitivity of Marine Systems to Climate and Fishing: Concepts,

Issues and Management Responses, 79 J. Mar. Systems 427 (2010) (attached to Atkinson

Declaration as Exhibit 17); Tristan Rouyer et al., Does Increasing Mortality Change the

Response of Fish Populations to Environmental Fluctuations?, 15 Ecol. Letters 658 (2012)

(attached to Atkinson Declaration as Exhibit 18); Malin L. Pinsky & David Byler, Fishing, Fast

Growth and Climate Variability Increase the Risk of Collapse, 282 Proc. Royal Soc'y B

20151053 (2015) (attached to Atkinson Declaration as Exhibit 19).

None of this should be a surprise. Defendants themselves have acknowledged the

consequences of allowing large overages to go unrepaid. Dealing with an overage of 400,000

pounds, which is slightly less than the amount at stake in this case, NMFS noted a few years ago

that failing to repay the amount "could have serious conservation impacts including failure to

meet the greater amberjack stock's rebuilding timeline of 2027, which could result in the need to

further reduce catch levels and also could result in negative socio-economic effects in the long-

term." 87 Fed. Reg. 44,027, 44,029 (July 25, 2022).

35

As commercial fishermen and fish buyers, Plaintiffs' careers and livelihoods—as well as their identities and values—are intimately tied to fish and fishing. Their fates are connected with the fates of fish stocks in the Gulf, such that when the fish stocks thrive, they thrive, and when fish stocks struggle, they struggle.

This interdependence comes from lifetimes spent on the water, at the docks, and in the warehouses, working with fish. Commercial fishing is the last major wild-capture food source remaining for humans, and while many of the dangers portrayed in Hemmingway's *The Old Man and the Sea* have been eased by modern technology, the relationship with the ocean and fish populations persists. It is a relationship that goes beyond business and revenues,[9] and encompasses much of Plaintiffs' and their colleagues' lives. They catch fish, they think about fish, they eat fish, they buy and sell fish, they talk about fish, they know where to find fish in the ocean, and they can tell you innumerable details about a fish just from looking at it. Their lives, in short, are intertwined with fish. Walker Decl. ¶¶2-10, 18-19; Krebs Decl. ¶¶24-26; Rash Decl. ¶¶35-37; Maginnis Decl. ¶¶10-18, 22-26.

Plaintiffs also want to see a new generation of fishermen, fish buyers, and processors entering the field—their kids and grandkids—and they know in order for that to happen, Gulf fish stocks must be healthy. Krebs Decl. ¶27; Maginnis Decl. ¶¶27-28; *see also* Walker Decl. ¶5. Barriers to entering the fishery already are high, and depleted fish stocks will result in fewer people in the next generation entering the field, with Plaintiffs' trade and culture diminishing as a consequence.

---

[9] The business and economic aspects of Plaintiffs' lives are important as well, and are discussed in their declarations. *See* Krebs Decl. ¶¶17-22; Walker Decl. ¶¶20-23; Rash Decl. ¶¶15-22; Maginnis Decl. ¶¶19-21, 24.

So for all these reasons, when an action harms a fish stock arbitrarily—as Defendants' action is doing here—Plaintiffs in turn bear those harms. *Cf. Am. First Legal Found.*, No. 1:24-cv-1092-RC, at 29 ("The premise of Plaintiff's argument—a premise which Defendants do not meaningfully dispute—is that the loss or destruction of federal records is a significant harm to *both Plaintiff and the public*, and that it is a harm that cannot be cured once the records are lost or destroyed." (emphasis added)); *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.").

## III.    The Balance of Equities and Public Interest Favor Injunctive Relief

Under the third prong of the preliminary injunction standard, the court "weighs the harm to [the plaintiff] if there is no injunction against the harm to the [defendant] if there is." *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citing *Winter*, 555 U.S. at 25-26). And under the fourth prong, courts consider whether "an injunction is in the public interest." *Winter*, 555 U.S. at 20. These two inquiries "merge when the Government is the opposing party," because the government's interests in theory are the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

These factors are simple in the situation at hand. Denying an injunction to Plaintiffs will directly harm them, as well as the resource, for all the reasons discussed in the previous section. This weighs heavily in the balance of equities. *See, e.g.*, *Amoco Prod. Co.*, 480 U.S. at 545 (noting that if environmental injury "is sufficiently likely, . . . the balance of harms will usually favor the issuance of an injunction to protect the environment").

Granting an injunction, by contrast, will not harm Defendants at all. The only thing it will do is compel them to follow their own regulations—which is not a cognizable harm. As this

Court has previously noted: "[t]here is generally no public interest in the perpetuation of unlawful agency action. On the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their . . . operations." *Am. First Legal Found.*, No. 1:24-cv-1092-RC, at 34 (cleaned up). Defendants get no weight in the balance of the equities.

Moreover, the public interest here is shaped by the merits: because Plaintiffs are highly likely to succeed in showing that Defendants are unlawfully withholding application of 50 C.F.R. § 622.41(a)(2)(ii), it would serve the public interest for the Court to order an injunction. *See Am. First Legal Found.*, No. 1:24-cv-1092-RC, at 34 ("Plaintiff's strong likelihood of success on the merits of its claim that CDC is unlawfully and prematurely deleting its former employees' emails indicates that a preliminary injunction would serve the public interest."); *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) ("A party's likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest because there is generally no public interest in the perpetuation of unlawful agency action." (cleaned up)); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA."). Thus the third and fourth injunction factors tilt in favor of Plaintiffs.

## CONCLUSION

For the reasons above, Plaintiffs respectfully requests the Court grant Plaintiffs' motion for temporary restraining order and preliminary injunction.

Plaintiffs further respectfully request the court "advance the trial on the merits and consolidate it with the [preliminary injunction] hearing." Fed. R. Civ. P. 65(a)(2); *e.g.*, *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62-63 (D.D.C. 2014) (Contreras, J.) (merging

preliminary injunction and summary judgment stages). Plaintiffs believe doing so would be an efficient way to proceed, as further factual development is not necessary.

Dated:  September 23, 2025                    Respectfully submitted,

                                              /s/ Seth Atkinson
                                              Seth L. Atkinson (Bar ID CA00190)
                                              Quillback Consulting
                                              348 Nobel Drive
                                              Santa Cruz, CA 95060
                                              (203) 331-2792
                                              seth@quillbackconsulting.com

                                              *Attorney for Plaintiffs*